**Lawrence Joseph JEFFERSON, Petitioner,**

**v.**

**Eric SELLERS, Warden, Georgia Diagnostic and Classification Center, Respondent.**

CIVIL ACTION NO. 1:96–CV–0989–CC

United States District Court, N.D. Georgia, Atlanta Division.

Signed April 10, 2017

Court's CM/ECF system.

Lawrence Joseph Jefferson, Jackson, GA, pro se

Jeffrey Lyn Ertel, Suzanne Hashimi, Federal Defender Program Inc., John Richard Martin, Atlanta, GA, for Petitioner

Beth Attaway Burton, Office of State Attorney General, Sabrina D. Graham, Attorney General's Office, Department of Law, Atlanta, GA, for Respondent

## OPINION AND ORDER

CLARENCE COOPER, SENIOR
UNITED STATES DISTRICT JUDGE

This matter is before the Court on remand from the Supreme Court of the United States and the Eleventh Circuit Court of Appeals for development of the record related to the state habeas corpus court's process of addressing and resolving

Petitioner Lawrence Joseph Jefferson's state habeas petition and specifically for a determination regarding whether the state habeas corpus court's factual findings warrant a presumption of correctness pursuant to 28 U.S.C. § 2254(d). Following limited discovery, Petitioner and Respondent fully briefed this issue. The Court subsequently heard oral arguments from the parties and ruled from the bench that the state habeas corpus court's factual findings do not warrant a presumption of correctness because the state habeas corpus court's hearing and factfinding procedure were not full, fair, and adequate and denied Petitioner due process. In light of that ruling, the Court held an evidentiary hearing to resolve the limited factual dispute concerning whether Petitioner's trial attorneys were advised by a mental health expert that investigating a traumatic head injury Petitioner suffered as a child was unnecessary. The parties have filed post-hearing briefs, and the Court has re-evaluated Petitioner's claim that his trial counsel rendered ineffective assistance in preparing for the penalty phase of his trial. The Court now enters this written opinion to memorialize the findings and conclusions underlying this Court's determination that the state habeas corpus court's factual findings are not entitled to a presumption of correctness and to set forth the Court's ruling on Petitioner's ineffective assistance of counsel claim with the benefit of the additional evidence adduced at the evidentiary hearing. Because that additional evidence only bolsters this Court's prior determination that Petition-

er's trial counsel rendered ineffective assistance when they failed to investigate the traumatic head injury Petitioner suffered as a child, the Court again grants Petitioner habeas relief on his claim that his trial counsel were constitutionally ineffective during the penalty phase of the trial.

## I. BACKGROUND[1]

Petitioner Lawrence Joseph Jefferson was convicted of felony murder and armed robbery and sentenced to death in the Superior Court of Cobb County. The Supreme Court of Georgia affirmed the convictions and death sentence. Jefferson v. State, 256 Ga. 821, 353 S.E.2d 468 (1987). Following the conclusion of the appeal, Petitioner sought state habeas relief in the Superior Court of Butts County.

Petitioner's state habeas corpus action was assigned to now-deceased Judge Joseph B. Newton, a superior court judge in the Waycross Judicial Circuit. Among the issues Petitioner raised in his state habeas petition was whether Petitioner had received ineffective assistance of counsel during the capital sentencing proceedings. Specifically, Petitioner claimed his trial counsel rendered constitutionally inadequate assistance because they failed to reasonably investigate a head injury he sustained as a child when an automobile rolled over his head. A psychologist named Dr. Gary Dudley, who had examined Petitioner before trial, had stated in a written report that, because of Petitioner's head injury during childhood, it would be worthwhile to conduct a neuropsychological eval-

---

1. The factual background of this case is described in great detail in this Court's previous opinion. Jefferson v. Terry, 490 F.Supp.2d 1261, 1270–76 (N.D. Ga. 2007), aff'd in part, rev'd in part and remanded sub nom. Jefferson v. Hall, 570 F.3d 1283 (11th Cir. 2009), cert. granted, judgment vacated on other grounds sub nom. Jefferson v. Upton, 560 U.S. 284, 130 S.Ct. 2217, 176 L.Ed.2d 1032 (2010) and vacated on other grounds and remanded, No. 07-12502, 2010 WL 3431652 (11th Cir. July 21, 2010). Moreover, the parties are familiar with the facts and lengthy procedural history of this case. As such, the Court will repeat in this Opinion and Order only the facts that are relevant to the issues under consideration.

uation to rule out brain damage. Petitioner's trial counsel never had that evaluation performed.

The state habeas corpus court held an evidentiary hearing over the course of two days. In response to Petitioner's claim that his trial counsel performed in a constitutionally deficient manner, one of Petitioner's trial attorneys testified they did not pursue the testing for brain damage because Dr. Dudley, following the issuance of his written report, stated during a phone call that such testing may be a waste of time and that Petitioner was "just a criminal." Dr. Dudley, who did not testify live during the evidentiary hearing but submitted a sworn affidavit, denied making these statements and reiterated the opinion stated in his formal report that a neuropsychological examination was necessary. Dr. Dudley denied ever suggesting to Petitioner's trial attorneys that such testing was unnecessary and would not be worthwhile. At the conclusion of the evidentiary hearing, the state habeas corpus court requested post-hearing briefs from both Petitioner and Respondent.

Petitioner filed his post-hearing brief on October 23, 1991. Thereafter, Respondent filed a post-hearing brief on December 24, 1991. These post-hearing briefs remained pending before the state habeas corpus court for eight months before any known activity occurred in the case. In August 1992, Wendell Boyd English, a law clerk who was assisting Judge Newton with Petitioner's case, contacted Paula Smith, Respondent's counsel at the time, to request that Respondent submit a proposed order denying habeas relief. Ms. Smith prepared and submitted the proposed order, and Judge Newton ultimately signed the proposed order she prepared.

The Supreme Court of Georgia affirmed the denial of state habeas relief, Jefferson v. Zant, 263 Ga. 316, 431 S.E.2d 110 (1993), and Petitioner then sought federal

habeas relief in this Court. Petitioner again raised the claim that his trial counsel were ineffective during the sentencing phase. Petitioner also urged the Court not to give any deference to the state habeas court's factual findings, claiming that the state habeas court simply signed Respondent's proposed order and suggesting that the state habeas judge had not even read the proposed order. This Court found that Petitioner's trial counsel were ineffective during the capital sentencing proceeding because their decision not to present mental health evidence was not based on a reasonable investigation of Petitioner's mental health, even presuming the correctness of the state habeas corpus court's factual findings.

The United States Court of Appeals for the Eleventh Circuit disagreed that trial counsel were constitutionally ineffective and reversed the judgment previously entered by this Court on this point. Jefferson v. Hall, 570 F.3d 1283, 1309, 1311 (11th Cir. 2009). Petitioner then petitioned the United States Supreme Court for a writ of certiorari, which the Supreme Court granted. Jefferson v. Upton, 560 U.S. 284, 130 S.Ct. 2217, 176 L.Ed.2d 1032 (2010). The Supreme Court found that Petitioner had repeatedly raised an issue before state and federal courts that required further factual development – whether the state habeas corpus court's factual findings warranted deference, in light of what Petitioner claimed was a deficient procedure employed by the state habeas corpus court in reviewing the ineffective assistance claim. Id. at 289, 130 S.Ct. 2217. The Supreme Court reasoned that Petitioner essentially had argued "that the state court's 'fact-finding procedure,' 'hearing,' and 'proceeding' were not 'full, fair, and adequate.'" Id. at 292, 130 S.Ct. 2217 (quoting 28 U.S.C. § 2254(d)(2), (6), (7)). The Supreme Court thus remanded the case for the lower courts to determine "the precise nature of

what transpired during the state-court proceedings." 560 U.S. at 294, 130 S.Ct. 2217.

## II. STATE HABEAS EVIDENTIARY HEARING AND PROCEEDINGS

### A. Facts Discovered Upon Remand

Since the remand of this action to this Court, the following individuals have been deposed: (1) Paula Smith, Assistant Attorney General, who was lead counsel for Respondent during the state habeas proceedings; (2) J. Christopher Desmond, an attorney then with Schreeder, Wheeler, and Flint, who was pro bono counsel for Petitioner during the state habeas proceedings; (3) Elizabeth Vila Rogan, who was then an attorney with the Georgia Resource Center and provided support to Mr. Desmond; and (4) Wendell Boyd English, who was then a law clerk in the Waycross Judicial Circuit and assisted the state habeas corpus judge, Joseph B. Newton.[2] The deposition testimony of these witnesses, along with the state court record, confirms many of the facts previously known. Notwithstanding that the Court has set forth many of these facts in the background section above, a full account of what transpired before the state habeas corpus court follows below and is largely uncontested by the parties.

After the conclusion of Petitioner's direct appeal, Petitioner filed a state habeas corpus action in the Superior Court of Butts County, where he was being held on death row at the Georgia Diagnostic and Classification Prison in Jackson, Georgia. Among the numerous issues raised in the habeas petition was whether Petitioner had received effective assistance of counsel during the capital sentencing proceedings. State habeas corpus actions in capital cases previously had been handled by Judge Alex Crumbley, a superior court judge from Butts County. (Deposition of Paula A. Smith "Smith Dep." [Doc. No. 199–2] at 7.) However, at the urging of Judge Crumbley, who had become a state senator, the Georgia General Assembly passed a statute permitting judges from other circuits to be assigned to handle state habeas corpus actions filed by prisoners on death row. (Smith Dep. at 7.) As such, Judge Joseph B. Newton, who had never handled a habeas corpus action involving a capital case previously, was assigned Petitioner's case. (Smith Dep. at 8–9.)

As stated supra, Judge Newton held a two-day evidentiary hearing during which the parties presented numerous exhibits, affidavits, and live testimony. (Deposition of James Christopher Desmond "Desmond Dep." [Doc. No. 199–1] at 9–10; Smith Dep. at 9–10; Deposition of Elizabeth Vila Rogan "Rogan Dep." [Doc. No. 199–3] at 8.) At the conclusion of the hearing, the state habeas corpus court set a briefing schedule for post-hearing briefs. Petitioner filed his post-hearing brief on October 23, 1991, and Respondent filed a post-hearing brief on December 24, 1991.

At some point prior to August 20, 1992, Boyd English, in his capacity as the law clerk assisting Judge Newton with the case, contacted Paula Smith by telephone and asked Ms. Smith to prepare a proposed final order denying Petitioner state habeas relief. (Smith Dep. at 11–12.) Ms. Smith did not recall if Mr. English gave her further instructions as to what was to be included in the order, (Smith Dep. at 12), and Mr. English testified that Judge Newton did not give him any instructions with respect to how Ms. Smith was to draft the order, (Deposition of Wendell Boyd

---

**2.** All of the deposition transcripts and the exhibits attached thereto are included as attachments to the Notice of Manual Filing [Doc. No. 199] filed on June 10, 2011.

English "English Dep." [Doc. No. 199–4] at 8).

Ms. Smith did not consider the request unusual, as it was her recollection that it was "standard procedure" at that time for judges to ask the prevailing party to draft an order in state habeas cases. (Smith Dep. at 13–14.) Ms. Rogan, on the other hand, testified she had not had any prior experience and has not since had any experience with a judge simply requesting a proposed order from the respondent without requesting a proposed order from the petitioner as well. (Rogan Dep. at 11.)

While Ms. Smith did not recall the precise date she received Judge Newton's request from Mr. English, on August 20, 1992, Ms. Smith mailed to Mr. English the proposed final order she had prepared as well as a cover letter. Ms. Smith also sent a copy of the cover letter and proposed final order to Mr. Desmond. (Smith Dep. at 11–12; Petitioner's Exs. 1 and 2 [3].) There is no evidence Ms. Smith had any conversations or other communications with Judge Newton or anyone else on his behalf concerning the contents of the proposed final order, and Ms. Smith testified she had no such conversations or other communications. (Smith Dep. at 12, 16–17.) As stated previously, Mr. English simply told Ms. Smith to prepare a proposed final order denying habeas relief. (Smith Dep. at 12.)

Mr. English testified he did research and read the transcript of the hearing as well as whatever documents were forwarded to Judge Newton, but he does not remember seeing any post-hearing briefs. (English Dep. at 9, 12.) He does not remember having any lengthy discussion with Judge Newton about the case. (English Dep. at 12.) Mr. English does not recall ever reviewing the proposed final order or doing any research on the order. (English Dep. at 9, 13.) He likewise does not recall Judge Newton ever asking him to review the order or to do any drafting with respect to the order. (English Dep. at 9, 13.) He had nothing to do with the process of the execution of the proposed final order once it was submitted by Ms. Smith. (English Dep. at 10–11.)

Petitioner's state habeas counsel first learned of Judge Newton's request that Respondent's counsel prepare a proposed final order upon receipt of a copy of Ms. Smith's letter with the enclosed proposed final order for Judge Newton's signature. (Desmond Dep. at 13–14; Rogan Dep. at 9.) As reflected by Mr. Desmond's handwritten entry on Petitioner's Exhibit 1, the cover letter, Mr. Desmond received the cover letter and proposed final order on August 24, 1992. (Petitioner's Ex. 1; Desmond Dep. at 13.) Neither Mr. Desmond nor Ms. Rogan previously had been aware of any type of communication that anyone on behalf of the state habeas corpus court had had with Ms. Smith after the evidentiary hearing held on April 22 and 23 of 1991. (Rogan Dep. at 10.) Judge Newton had not asked Mr. Desmond or Ms. Rogan to submit a proposed final order at any time before August 20, 1992. (Desmond Dep. at 14; Rogan Dep. at 9–10.)

On August 28, 1992, counsel for Petitioner filed on Petitioner's behalf a Motion to Recuse Hearing Judge and a Motion to Reveal Ex Parte Communications. (Petitioner's Exs. 3 and 4.) In the Motion to Recuse Hearing Judge, counsel for Petitioner objected to Judge Newton's asking only one side to submit proposed findings of fact and conclusions of law. (Petitioner's Ex. 3 at ¶ 9.) Petitioner's counsel further explained in the filing that Petitioner would have offered competing proposed

3. All references to Petitioner's exhibits in this section of the Order refer to the exhibits to the depositions of Mr. Desmond, Ms. Rogan, Ms. Smith, and Ms. English.

findings of fact and conclusions of law if such had been requested or permitted from Petitioner. (Petitioner's Ex. 3 at ¶ 10; Desmond Dep. at 14–15.)

Judge Newton summarily denied the Motion to Recuse Hearing Judge on September 28, 1992, and never invited Petitioner's counsel to file a competing proposed order or competing proposed findings of fact and conclusions of law. (Petitioner's Ex. 6; Desmond Dep. at 16; Rogan Dep. at 11–12.) Judge Newton never explicitly prohibited Petitioner's counsel from filing a competing proposed order or competing proposed findings of fact and conclusions of law. (Rogan Dep. at 14.)

Two days after denying the Motion to Recuse Hearing Judge, Judge Newton executed an order that, except for the concluding sentence, date, and his signature, was identical to the proposed order drafted by Respondent. (Petitioner's Ex. 7; Desmond Dep. at 17–18; Smith Dep. at 17; Rogan Dep. at 13.) That order was subsequently filed in the Superior Court of Butts County on October 7, 1992. (Petitioner's Ex. 7.) During the subsequent appeal of that order to the Georgia Supreme Court, the parties stipulated "that the state habeas corpus judge adopted the proposed order as his own." (Petitioner's Exs. 8, 9.)

Throughout the order executed by Judge Newton, there are no corrections of misspellings, no corrections of grammatical errors, and no corrections of incorrect citations to cases. (See generally Petitioner's Ex. 7.) Petitioner has identified the presence of twenty-one errors in the order, which this Court has verified. (Petitioner's Brief Regarding Issue Remanded by Supreme Court [Doc. No. 200] at 7–8.) Significantly, both the proposed order and the final order refer to the affidavit of an attorney who was never contacted in connection with this case, and no such affida-

vit was submitted as evidence. (Desmond Dep. at 10–11; Petitioner's Ex. 1 at 24–25; Petitioner's Ex. 7 at 24–25.) These errors and issues invite the reasonable inferences that Judge Newton failed to review the proposed order submitted by Ms. Smith before executing the final order and failed to review the relevant evidence.

Judge Newton passed away in 2000. (English Dep. at 10.) Mr. English does not know whether Judge Newton read the proposed order prior to signing it. (English Dep. at 13.) Mr. English merely would have forwarded the proposed order along to Judge Newton immediately. (English Dep. at 8, 10–11.)

### B. Applicable Law

Petitioner's habeas application was filed prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 and is therefore governed by federal habeas law as it existed prior to that point. Lindh v. Murphy, 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Questions of law and mixed questions of law and fact resolved by state habeas courts are reviewed de novo, while the state court's factual findings are "subject to the presumption of correctness." Freund v. Butterworth, 165 F.3d 839, 861 (11th Cir. 1999). The Supreme Court has held "[when] the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings," the district court "ordinarily should . . . accept the facts as found" by the state court judge. Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), overruled on other grounds by Keeney v. Tamayo–Reyes, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). However, "if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding[,]" then the federal

court "must hold an evidentiary hearing" in an attempt to resolve any disputed factual issues. Id. at 312, 83 S.Ct. 745.

■ An almost verbatim codification of the standards set forth in Townsend, 28 U.S.C.A. § 2254(d), as it applies to this case, provides as follows:

> (d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit-
>
> (1) that the merits of the factual dispute were not resolved in the State court hearing;
>
> (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
>
> (3) that the material facts were not adequately developed at the State court hearing;
>
> (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
>
> (5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
>
> (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
>
> (7) that the applicant was otherwise denied due process of law in the State court proceeding;
>
> (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:
>
> And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

28 U.S.C.A. § 2254 (1976). Where one of the eight exceptions applies, the state court's factfinding is not presumed correct, and the petitioner must establish "the facts necessary to support his claim by only a preponderance of the evidence." Kelley v. Secretary for Dep't of Corrections, 377 F.3d 1317, 1335 (11th Cir. 2004) (citations omitted).

C. Contentions of the Parties

Petitioner maintains that the factual findings of the state habeas corpus court are not entitled to a presumption of correctness due to (1) the state habeas judge's verbatim adoption of an order prepared by Ms. Smith without any guidance as to what the state habeas judge expected in the

proposed order; (2) the state habeas court's ex parte communication with Ms. Smith; (3) the failure of the state habeas judge to correct twenty-one (21) cited errors in the proposed findings of fact and conclusions of law prepared by Ms. Smith; (4) the failure of the state habeas judge to provide Petitioner an opportunity to file his own proposed findings of fact and conclusions of law or objections to the proposed findings of fact and conclusions of law prepared by Ms. Smith; and (5) the factual error overlooked by the state habeas judge when he adopted the proposed findings of fact and conclusions of law, which referenced an affidavit of an attorney that was not a part of the record. Petitioner contends that the only way to address the failure of the state habeas corpus court to provide Petitioner with a full, fair, and adequate factfinding process consistent with due process is for this Court to "independently hear the evidence regarding disputed factual issues between the parties and make its own de novo determination regarding them." (Doc. No. 200 at 18.)

Respondent argues that the record establishes that Petitioner had a full and fair hearing before the state habeas corpus court, notwithstanding any procedural errors that occurred. Respondent maintains Petitioner was given the opportunity to present evidence through live testimony, numerous exhibits, and affidavits. Respondent also asserts Petitioner did have the opportunity to submit his own proposed order or objections to Respondent's proposed order but did not avail himself of that opportunity. For these reasons, Respondent urges the Court to conclude that Petitioner has failed to establish that the state habeas proceedings were fundamentally unfair.

### D. Analysis

The Supreme Court has discouraged and criticized a court's verbatim adoption of findings of fact prepared by a prevailing party. Anderson v. City of Bessemer City, 470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Still, the Court acknowledges such findings as the findings of the court and has held that they may be disturbed only if they are clearly erroneous. Id. In the case at bar, the Supreme Court stated that it has "not considered the lawfulness of, nor the application of the habeas statute to, the use of such a practice where (1) a judge solicits the proposed findings ex parte, (2) does not provide the opposing party an opportunity to criticize the findings or to submit his own, or (3) adopts findings that contain internal evidence suggesting that the judge may not have read them." Jefferson, 560 U.S. at 294, 130 S.Ct. 2217 (citations omitted). The Supreme Court has tasked this Court with undertaking such an analysis and determining, in light of the developed record, whether the state habeas court's factual findings warrant a presumption of correctness. Id.

Petitioner maintains he was not provided with a "full, fair, and adequate" factfinding process during the state habeas corpus proceedings. He therefore asserts that no presumption of correctness should apply to the factual findings under the principles of Townsend and former 28 U.S.C. § 2254(d)(2), (6), and (7). The Court agrees.

"The adequacy of a state-court procedure under Townsend is largely a function of the circumstances and the interests at stake. In capital proceedings generally, th[e] [Supreme] Court has demanded that factfinding procedures aspire to a heightened standard of reliability." Ford v. Wainwright, 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (citation omitted). "This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfath-

omable of penalties; that death is different." Id. (citation omitted).

■ "The question whether state procedures are 'adequate' involves two distinct inquiries. The first is whether the procedure employed in a particular case in fact afforded the defendant a full and fair hearing. The second is whether the procedure itself comports with due process." Cabana v. Bullock, 474 U.S. 376, 399 n. 2, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986). With respect to the latter inquiry, the Fourteenth Amendment of the United States Constitution forbids states from depriving any person of life without due process of law. Roberts v. Louisiana, 428 U.S. 325, 350, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). The Supreme Court has stated that notice and an opportunity to be heard in a manner appropriate to the nature of the case are essential requirements of procedural due process. See Boddie v. Connecticut, 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (citation omitted).

■ In this case, the factfinding procedure employed by the state habeas corpus court was not adequate to afford Petitioner a full and fair hearing and the deficient procedure employed deprived Petitioner of due process of law. The factual findings and conclusions of law ultimately adopted by Judge Newton were drafted exclusively by Ms. Smith pursuant to an ex parte request made on the state habeas judge's behalf by the law clerk working on the case. Judge Newton did not provide any drafting instructions or guidance as to his own findings and conclusions, other than to state that the proposed order should deny habeas relief. Judge Newton did not request that Petitioner submit his own proposed factual findings and conclusions of law, and Judge Newton did not even inform Petitioner of the request made of Ms. Smith. Once Petitioner learned of the proposed order prepared by Ms. Smith, it is true that he could have requested an opportunity to submit a competing proposed order or specific objections to the proposed order prepared by Ms. Smith, but it was reasonable for Petitioner to believe Judge Newton had reached a firm decision and that any further filings concerning the merits of the case would be futile. Judge Newton's failure to invite Petitioner to present a competing order, even after Petitioner learned of, inquired further about, and criticized the ex parte request made of Ms. Smith, emphasizes the reasonableness of Petitioner's belief that a competing proposed order would have been futile. Moreover, a comparison of the proposed order prepared by Ms. Smith to the order ultimately executed by the state habeas corpus court indicates Judge Newton "uncritically accepted findings prepared without judicial guidance." Anderson, 470 U.S. at 572, 105 S.Ct. 1504. There is thus a basis for substantial doubt as to whether the findings of fact and conclusions of law included in the final order represent the court's own analysis and considered conclusions. This is particularly so, given that the state habeas corpus court's order references an affidavit that was never submitted in the case and contains numerous typographical errors that Judge Newton either never saw. or overlooked.[4] While these findings of fact and conclusions of law are nevertheless treated as findings and conclusions of the state habeas corpus court, id. at 572, 105 S.Ct. 1504, the practice of adopting verbatim findings of fact prepared by the pre-

---

4. Respondent argues the affidavit was not really an issue in the case because the affidavit was inadmissible. However, the admissibility of the affidavit is irrelevant. The critical fact is Judge Newton entered an order that erroneously referenced an affidavit, which was not a part of the evidence in the case. This is internal evidence that Judge Newton did not review the order carefully, and perhaps did not read the order, before signing it.

vailing party in the context of a death penalty case is especially troublesome, given that factfinding procedures in capital proceedings are to "aspire to a heightened standard of reliability," see Ford, 477 U.S. at 411, 106 S.Ct. 2595.

Critical to the resolution of the ineffective assistance of counsel claim, in particular, was a credibility determination that Judge Newton did not appear to consider carefully, if at all, himself. As noted above in this Court's discussion of the case background and factual findings upon remand and as detailed in this Court's prior Order, Jefferson, 490 F.Supp.2d at 1324–25, Petitioner's trial counsel, Mr. Schuster, and one of Petitioner's mental health experts, Dr. Dudley, offered conflicting testimony concerning whether Dr. Dudley advised Mr. Schuster orally that it would be futile for Petitioner's attorneys to follow up on Dr. Dudley's previous written recommendation of conducting neuropsychological testing to rule out brain damage. Mr. Schuster and Dr. Dudley also offered conflicting testimony about whether Dr. Dudley referred to Petitioner as "just a criminal." In the order adopted verbatim by the state habeas corpus court, Judge Newton credited the testimony of Petitioner's trial counsel over the testimony of Dr. Dudley without providing any explanation whatsoever for that credibility determination. All of the language concerning this credibility determination is the precise language contained in the proposed order prepared by Ms. Smith.

The state habeas judge's failure to indicate in any manner that the credibility determination was the product of his own observations and analysis distinguishes this case from the Supreme Court's decision in Anderson, where the Supreme Court criticized the practice by some courts of announcing a decision and then adopting verbatim findings of fact prepared by prevailing parties. 470 U.S. at

572, 105 S.Ct. 1504. In Anderson, the district court adopted proposed findings of fact and conclusions of law prepared by the prevailing party. The Fourth Circuit suggested that close scrutiny of the record was warranted as a result. The Anderson court ultimately held "that even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." Id. at 572, 105 S.Ct. 1504. Still, the Court noted in that case that the district court had (1) issued a preliminary memorandum outlining its essential findings; (2) provided the non-prevailing party an opportunity to respond to the prevailing party's more detailed proposed findings, which the non-prevailing party did; and (3) made changes to the content and organization of the crucial findings submitted by the prevailing party, including those regarding matters requiring credibility determinations. Id. at 572–73, 577–80, 105 S.Ct. 1504. For these reasons, the Court found "no reason to doubt that the findings issued by the District Court represent[ed] the judge's own considered conclusions" and "no reason to subject those findings to a more stringent appellate review than [was] called for by the applicable rules." Id. at 573, 105 S.Ct. 1504.

The indicia of the judge's independent analysis and review in Anderson are completely absent in this case. Here, Judge Newton did not provide a preliminary memorandum outlining his essential findings, and he did not otherwise provide, through Mr. English, any instructions to Ms. Smith about how the proposed order was to be drafted, except to instruct that the proposed order was to deny habeas relief. Judge Newton did not offer Petitioner an opportunity to respond to Ms. Smith's proposed order and did not even inform Petitioner that a request had been made of Ms. Smith to prepare proposed findings of fact and conclusions of law.

Even after Petitioner learned from Ms. Smith of the ex parte request, Judge Newton still did not provide Petitioner an opportunity to offer criticism of the proposed order or to submit his own proposed order. Finally, other than altering the concluding sentence and including the date and his signature, Judge Newton made no changes to the proposed order, notwithstanding the glaring errors contained therein. Judge Newton's reference to evidence that did not exist in this case raises doubts about whether Judge Newton was even familiar with the record at the time he executed Ms. Smith's proposed order.

The absence of an explanation for the credibility determination in this case is significant because of the hybrid nature of the evidence that was before the state habeas corpus court and the importance of that credibility determination to the resolution of the ineffective assistance of counsel claim. Here, the state habeas judge had the challenging task of making a credibility determination based on the live testimony of Petitioner's trial attorneys and the written affidavit of Dr. Dudley. It was critical for Judge Newton to explain his reasons for crediting the testimony of Petitioner's trial attorneys over the testimony provided by Dr. Dudley, but the procedure that Judge Newton employed to arrive at the final order deprived Petitioner and all reviewing courts of the benefit of such reasoning and undermines the deference that ordinarily would be afforded such a credibility determination. See Keystone Plastics, Inc. v. C & P Plastics, Inc., 506 F.2d 960, 962 (5th Cir. 1975) ("The reviewing court deserves the assurance that the trial court has come to grips with apparently irreconcilable conflicts in the evidence, such as appear in the case sub judice, and has distilled therefrom true facts in the crucible of his conscience.").

The factfinding procedures employed in this case also warrant condemnation under Eleventh Circuit authority criticizing "ghostwritten" orders. As the Eleventh Circuit reproached in Colony Square Co. v. Prudential Ins. Co., 819 F.2d 272 (11th Cir. 1987):

> This circuit and other appellate courts have repeatedly condemned the ghostwriting of judicial orders by litigants. The cases admonishing trial courts for the verbatim adoption of proposed orders drafted by litigants are legion. . . . When an interested party is permitted to draft a judicial order without response by or notice to the opposing side, the temptation to overreach and exaggerate is overwhelming. The proposed order or opinion serves as an additional opportunity for a party to brief and argue its case and thus is unfair to the party not accorded an opportunity to respond. The quality of judicial decisionmaking suffers when a judge delegates the drafting of orders to a party; the writing process requires a judge to wrestle with the difficult issues before him and thereby leads to stronger, sounder judicial rulings. In addition, the ex parte communications occasioned by this practice create an obvious potential for abuse.

Id. at 275–76 (internal citations omitted). In Colony Square, the Eleventh Circuit ultimately found no due process violation where a prevailing party had drafted three proposed orders at the ex parte requests of the bankruptcy court. Id. at 276. However, that first was based on the fact that the judge who made the request had reached a firm decision before asking the prevailing party to draft the proposed orders and had indicated the specific things that the orders were to cover. In the case before this Court, it appears Judge Newton also had reached a firm decision, but he provided no framework for the order or guidance as to the rationale for his decision. The Colony Square orders also had

been reviewed and affirmed by the district court, which provided the Eleventh Circuit some degree of comfort that the arguments of the non-prevailing party had been independently and thoroughly examined and that any deficient procedures employed by the bankruptcy judge had thus been corrected. In the case before this Court, in contrast, the presumption of correctness and deference that has followed the state habeas court's factual findings thus far has insulated them from meaningful review.

In sum, the process by which the state habeas judge arrived at the court's final order was fundamentally unfair. The ex parte communication with Ms. Smith compromised the fairness and reliability of the factfinding process so as to deny Petitioner a fair and adequate hearing at the state habeas level and to deny him due process of law. The failure of the state habeas judge to solicit criticism of the proposed final order from Petitioner or to invite him to submit his own proposed order, particularly after Petitioner took issue with the ex parte contact with Ms. Smith and Ms. Smith's preparation of the proposed order, likewise deprived Petitioner of a full and fair hearing and due process of law. Finally, the state habeas judge's verbatim adoption of Ms. Smith's proposed order in this case, including the evidentiary discrepancy

and other numerous errors contained therein, is an affront to the heightened concern with reliability and trustworthiness due a death penalty case and places the validity of the decision in issue. This case simply presents several reasons to conclude that the state habeas court, which was the only state court to hold a hearing on Petitioner's habeas claims,[5] did not "reliably [find] the relevant facts." Townsend, 372 U.S. at 313, 83 S.Ct. 745. Consequently, under 28 U.S.C. § 2254(d)(2), (6) and (7), the presumption of correctness afforded a state court's findings of fact does not apply in this case, making the evidentiary hearing that this Court conducted necessary to resolve the factual disputes relevant to Petitioner's ineffective assistance of counsel claim.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Findings of Fact from Federal Evidentiary Hearing

At the evidentiary hearing held before this Court on two separate days, the Court heard testimony from Petitioner's trial attorneys, Marc Cella and Stephen Schuster, and from several mental health professionals, including Dr. James R. Merikangas, Dr. Gary Dudley, Dr. David Price, and Dr. Steven Macciocchi. The following factual

---

5. Respondent argues that the "findings of fact" made by the Supreme Court of Georgia in affirming the Butts County Superior Court should be entitled to a presumption of correctness, notwithstanding the Court's finding that Petitioner was not afforded a full, fair, and adequate hearing that comported with due process before the state habeas corpus court. However, pursuant to O.C.G.A. § 9–11–52(a), the Supreme Court of Georgia was bound to accept the lower court's findings of fact, unless they were clearly erroneous. Thus, the Supreme Court of Georgia essentially deferred to the lower court's findings, which were not, to begin with, the product of a full, fair, and adequate hearing. Jefferson v. Zant,

263 Ga. 316, 317, 431 S.E.2d 110 (1993) ("declin[ing] Jefferson's invitation to accord the order less deference than mandated by O.C.G.A. § 9–11–52"). There was no independent, "full and fair hearing" before the Supreme Court of Georgia, and the Supreme Court of Georgia did not make its own independent factual determinations, which might be entitled to a presumption of correctness. For the reasons clearly and correctly set forth by Petitioner, none of the cases relied on by Respondent require or persuade the Court to reach a conclusion to the contrary. (See Petitioner's Reply to Respondent's Brief in Opposition to Petitioner's Post–Hearing Brief [Doc. No. 256] at 3–5.)

findings concern the decision of Petitioner's trial counsel not to present mitigating mental health evidence during Petitioner's sentencing proceedings and specifically address the factual dispute regarding whether Petitioner's attorneys were advised orally by Dr. Dudley that an investigation of the traumatic head injury Petitioner suffered as a child was unnecessary. These findings also address the conflicting expert evidence presented by the parties regarding the state of Petitioner's mental health.[6]

### 1. Trial Counsel's Investigation into Petitioner's Mental Health [7]

Mr. Cella and Mr. Schuster learned before trial that Petitioner suffered a head injury as a child. (Federal Hearing Tr.[8] at 15, 128–29.) Petitioner's mother had told them that Petitioner had been hit by a car when he was approximately two years old and that Petitioner was hospitalized as a result of that accident. (Federal Hearing Tr. at 16, 128–129.) Mr. Cella does not recall questioning the family about the head injury once he was made aware of it. (Federal Hearing Tr. at 16.) Aside from Petitioner's past behavioral issues arising from his abuse of alcohol, no one in Petitioner's family gave Mr. Cella or Mr. Schuster any information suggesting Petitioner had mental health problems. (Federal Hearing Tr. at 18, 121–22.)

While trial counsel learned about Petitioner's head injury prior to trial, they did not learn about the injury or any other facts to prompt a mental health investigation early during their background investigation. Neither Mr. Schuster nor Mr. Cella ever had any problems communicating with Petitioner. (Federal Hearing Tr. at 15, 119.) Mr. Cella's interactions with Petitioner did not cause him to have any questions about Petitioner's sanity, (Federal Hearing Tr. at 17), and Mr. Schuster testified that he saw no evidence of mental health concerns during his interactions with Petitioner, (Federal Hearing Tr. at 119). Petitioner was able to converse with Mr. Cella and Mr. Schuster in a rational way and respond to any questions they asked him. (Federal Hearing Tr. at 17.)

Notwithstanding that neither Mr. Cella nor Mr. Schuster perceived any issues with Petitioner's mental health, Mr. Cella testified he would always be concerned about a defendant's mental health and that it would be a matter of routine to investigate a defendant's mental health. (Federal Hearing Tr. at 18.) Hence, Mr. Cella and Mr. Schuster hired Dr. Dudley to perform a mental health examination as a matter of routine. (Federal Hearing Tr. at 17.) They did not have a specific concern regarding Petitioner's mental health. (Federal Hearing Tr. at 17.)

Dr. Dudley conducted a general psychological evaluation of Petitioner in December of 1985. (Federal Hearing Tr. at 94.) Dr. Dudley's evaluation of Petitioner was a

---

6. Petitioner's mental health evidence was unrebutted before the state habeas corpus court. Because this Court found that a de novo review of Petitioner's claim was warranted, the Court permitted Respondent an opportunity to present its own evidence concerning Petitioner's mental health.

7. While the Court's focus in this Order is on the mental health investigation, the Court remains aware of the entirety of trial counsel's efforts in investigating mitigating evidence in preparation for the penalty phase of Petitioner's trial. In evaluating the performance of trial counsel, the Court considers the entire scope of the background investigation, which is fully set forth in this Court's prior Order and in the Eleventh Circuit's Opinion and altered only slightly by the facts this Court has found upon remand. Jefferson, 490 F.Supp.2d at 1319–21; Jefferson, 570 F.3d at 1292–96.

8. The transcript for the evidentiary hearing held before this Court is in the record at Document Numbers 238 and 240. Pages 1 through 114 may be found at Document Number 238, and pages 115 through 263 are available at Document Number 240.

**1356**

combination of a general intelligence test and a couple of personality tests as well. (Federal Hearing Tr. at 94.) Dr. Dudley was not given any documents, such as arrest records or school records, before he went in to evaluate Petitioner. (Federal Hearing Tr. at 93, 94, 96.) The only information Dr. Dudley received about Petitioner's background came from Petitioner himself. (Federal Hearing Tr. at 95.) He learned during his interview of Petitioner that Petitioner had been hit by a car when he was two years of age, but Dr. Dudley had no documents to corroborate that such an accident had occurred and Dr. Dudley had no idea at the time he conducted Petitioner's evaluation that Petitioner had been hospitalized for five days after that accident occurred. (Federal Hearing Tr. at 95.)

On February 10, 1986, after completing his evaluation, Dr. Dudley prepared a report that indicated, in part, the following:

> One possibility that could not be explored because of his incarceration has to do with the sequelae to head injury experienced during childhood. In my opinion, it would be worthwhile to conduct neuropsychological evaluation of this individual to rule out an organic etiology.

Petitioner's Ex. 5.[9] Influencing his recommendation that a neuropsychological assessment be performed were Petitioner's results on the general intelligence test Dr. Dudley administered. (Federal Hearing Tr. at 97.) Petitioner's verbal score, which was derived from subtests on a battery that relied on stories, retrieval, and usage of language-related information, was a 94.

(Federal Hearing Tr. at 97.) Petitioner's performance score, which concerned visual spatial acuity, speed of motor performance, and accuracy of visual perception, was 108. (Federal Hearing Tr. at 97.) According to Dr. Dudley, "[w]ith that discrepancy between the two areas of function, one has to at least suspect impairment to functions organizing the left cerebral hemisphere." (Federal Hearing Tr. at 97.)

Dr. Dudley also administered the Wide Range Achievement Test during his evaluation of Petitioner. (Federal Hearing Tr. at 97–98.) Petitioner's results on that test indicated a learning disability. (Federal Hearing Tr. at 99.) Specifically, Petitioner was found to function on a tenth grade level with respect to reading; a fourth grade level with respect to spelling; and a seventh grade level with respect to arithmetic. (Federal Hearing Tr. at 98.) Dr. Dudley characterized Petitioner's results as "significant degraded scores," stated that they were consistent with a learning disability, and indicated that a learning disability could be the result of a problem with brain function. (Federal Hearing Tr. at 99.)

Dr. Dudley's testing did not reveal any evidence of someone who would be chronically aggressive, but Dr. Dudley concluded from Petitioner's results on the general psychological tests that Petitioner was likely to be impulsive and not prone to give forethought to the consequences of his actions. (Federal Hearing Tr. at 99.) The latter is a symptom of executive dysfunction, which has to do with an incapacity for planning and anticipating consequences in

9. All references to Petitioner's exhibits in this section of the Order refer to exhibits entered into evidence during the evidentiary hearing held before this Court. These exhibits are located on the Court's docket at Document Number 241. Likewise, most references to Respondent's exhibits in this section of Order refer to exhibits entered into evidence during the evidentiary hearing, and these exhibits are located on the Court's docket at Document Number 242. There are a few references to "Respondent's Ex. 39" and "Respondent's Ex. 40." The latter exhibits are a part of the exhibits originally filed by Respondent shortly after this habeas case was first commenced.

outcomes, organizing, sustaining attention, invoking arousal where arousal is appropriate, and inhibition of impulse where that is appropriate. (Federal Hearing Tr. at 100–01.) Dr. Dudley testified that the frontal lobes are generally thought to be the primary side of executive functioning. (Federal Hearing Tr. at 100.)

Consistent with the above, Dr. Dudley noted in his report that Petitioner became agitated and disorganized in his behavior during one of Dr. Dudley's visits and refused to engage. (Federal Hearing Tr. at 101.) Petitioner had been cooperative and agreeable during Dr. Dudley's first visit but was completely different on this occasion. (Federal Hearing Tr. at 101.) Before he left, Dr. Dudley explained to Petitioner that it was not a good idea for Petitioner to refuse to cooperate with him. (Federal Hearing Tr. at 101–02.) When Dr. Dudley went back again to see Petitioner, Petitioner apologized and explained, "I get that way sometimes, man." (Federal Hearing Tr. at 102.) Following that visit, Dr. Dudley became concerned about whether Petitioner suffered from a neurological impairment, as Petitioner's conduct was indicative of impulsive behavior, a lapse in judgment, and difficulty with the regulation of affective and emotional behavior. (Federal Hearing Tr. at 102.)

Following the evaluation and issuance of Dr. Dudley's report, Mr. Cella recalls that Dr. Dudley basically stated that he did not feel like he would be particularly helpful as a mitigating witness because Mr. Cella and Mr. Schuster's litigation strategy was not for Petitioner to admit the crime. (Federal Hearing Tr. at 18–19.) According to Mr. Cella and Mr. Schuster, Petitioner was adamant in denying he committed the crime. (Federal Hearing Tr. at 19, 120.) Therefore, since residual doubt was one of the strategies Mr. Cella and Mr. Schuster intended to employ during the sentencing phase, they did not feel Dr. Dudley could

provide any information that would have aligned with that strategy. (Federal Hearing Tr. at 19.)

Although Mr. Cella and Mr. Schuster received Dr. Dudley's report and thus were aware of Dr. Dudley's recommendation that neuropsychological testing be done to rule out brain damage, they never moved forward with further testing. Mr. Cella acknowledged that Dr. Dudley made the recommendation in his written report that there be further evaluation of Petitioner, but Mr. Cella never spoke with Dr. Dudley regarding this recommendation. (Federal Hearing Tr. at 19.) Mr. Cella testified inexperience was the reason for his failure to follow up with Dr. Dudley on the recommendation. (Federal Hearing Tr. at 20.) Mr. Cella does not recall even having a conversation with Mr. Schuster regarding Dr. Dudley's recommendation of a further evaluation, and he testified to having no knowledge of any conversation between Mr. Schuster and Dr. Dudley regarding that part of Dr. Dudley's report. (Federal Hearing Tr. at 20.)

When Mr. Schuster was questioned during the evidentiary hearing about why he and Mr. Cella did not pursue neuropsychological testing, as recommended by Dr. Dudley, Mr. Schuster testified that a conversation they had with Dr. Dudley subsequent to Dr. Dudley's provision of the written report led them to the "decision that there was no sense pursuing any further evaluation of Mr. Jefferson." (Federal Hearing Tr. at 120.) Mr. Schuster figured that was the proper decision "when [Dr. Dudley] told [them] he was a sociopath or a psychopath and not to worry about it." (Federal Hearing Tr. at 120.) Mr. Schuster further testified that they asked Dr. Dudley about the portion of the report wherein Dr. Dudley stated that further evaluation needed to happen and, according to Mr. Schuster, Dr. Dudley stated "that Mr. Jef-

ferson was the way Mr. Jefferson was." (Federal Hearing Tr. at 120.) Mr. Schuster referred to Dr. Dudley's recommendation that neuropsychological testing be conducted as a "throw-out in the report" and stated they would have asked to do the testing if Dr. Dudley had told them that they "seriously" needed to do the testing. (Federal Hearing Tr. at 121.)

Contrary to the statements Mr. Schuster attributes to Dr. Dudley, Dr. Dudley consistently has denied ever withdrawing or rescinding his earlier recommendation. (Petitioner's Ex. 7 at 2 ¶ 4; Federal Hearing Tr. at 104–06, 111–12.) When questioned about Mr. Schuster's prior testimony before the state habeas court that Dr. Dudley told Mr. Schuster that Petitioner was "just a criminal," Dr. Dudley testified repeatedly he did not say Petitioner was "just a criminal" and was adamant that is not the type of thing he would have said. (Petitioner's Ex. 7 at 2 ¶ 5; Federal Hearing Tr. at 105–06, 112.)

Having observed the demeanor of Mr. Schuster and Dr. Dudley during the evidentiary hearing and having thoroughly familiarized itself with the record in this case, the Court finds that Dr. Dudley's testimony regarding this issue of whether he led Petitioner's trial attorneys to believe that neuropsychological testing was not necessary or might not be worthwhile, despite his written recommendation, is more credible than the testimony of Mr. Schuster. The Court resolves this credibility determination in Dr. Dudley's favor for several reasons.

First, Mr. Schuster's time sheets do not corroborate his having had a phone conversation with Dr. Dudley following Dr. Dudley's submission of his written report on February 10, 1986. (See Petitioner's Exs. 18 and 19.) Mr. Schuster's time sheets reflect he had a twelve-minute conversation with Dr. Dudley about Petitioner's mental health on December 10, 1985, which was two months before Dr. Dudley submitted his written report. (Petitioner's Ex. 18 at 2.) Thereafter, there is no entry reflecting Mr. Schuster ever spoke with Dr. Dudley again. (See Petitioner's Exs. 18 and 19.) Dr. Dudley did not recall ever having a conversation with Mr. Schuster following his submission of the written report, and Mr. Schuster's time sheets, which reflect numerous calls and conversations Mr. Schuster had with others, corroborate Dr. Dudley's recollection. This fact, alone, would not persuade the Court to credit Dr. Dudley's testimony over Mr. Schuster's, but it does provide the Court a reason to doubt the accuracy of Mr. Schuster's version of what transpired following trial counsel's receipt of Dr. Dudley's report.

Second, Mr. Schuster suggested repeatedly in his testimony before this Court that both he and Mr. Cella spoke to Dr. Dudley about the recommendation in the report that neuropsychological testing be conducted. (Federal Hearing Tr. at 120, 124, 125.) However, as mentioned above, Mr. Cella testified he never spoke with Dr. Dudley regarding this particular recommendation. (Federal Hearing Tr. at 19.) Mr. Cella does not recall having a conversation with Mr. Schuster regarding Dr. Dudley's recommendation of a further evaluation, and he has no knowledge of any conversation between Mr. Schuster and Dr. Dudley regarding that part of Dr. Dudley's report. (Federal Hearing Tr. at 20.) Thus, Mr. Schuster's testimony regarding the occurrence of this follow-up conversation with Dr. Dudley conflicts not only with Dr. Dudley's recollection, but also with Mr. Cella's.

Third, while the Court does not discount the impact that the passage of time may have had on the memories of witnesses, Mr. Schuster's testimony regarding Dr. Dudley's alleged comments to him regard-

ing Petitioner has been internally inconsistent and inconsistent with the other evidence in this case. At the hearing before the state habeas corpus court, Mr. Schuster testified that Dr. Dudley had stated further testing likely would not be worthwhile and that Petitioner was "just a criminal." At the hearing before this Court, Mr. Schuster said he did not pursue further testing because Dr. Dudley had said that Petitioner "was a sociopath or a psychopath." (Federal Hearing Tr. at 120.) Notably, no mental health professional who has evaluated Petitioner has diagnosed him with psychopathy or anti-social personality disorder. (Federal Hearing Tr. at 41, 48, 145, 245–46; Petitioner's Ex. 5.) As such, Mr. Schuster's claim that Dr. Dudley told him Petitioner was a sociopath or a psychopath is inconsistent with his testimony before the state habeas corpus court and is not supported by any evidence in the record.

Fourth, and as mentioned above, this Court took great care to observe the demeanor of Mr. Schuster and Dr. Dudley as they testified. The Court has considered the manner in which they testified and their respective attitudes while testifying. The Court likewise has considered Mr. Schuster's and Dr. Dudley's respective tones of voice and levels of engagement during the hearing. The Court's direct observations support giving more credit to Dr. Dudley's testimony than Mr. Schuster's testimony.

For all of the reasons stated, the Court credits Dr. Dudley's testimony that he consistently maintained that a neuropsychological evaluation would be worthwhile, and the Court also credits his testimony that he did not make any of the derogatory statements about Petitioner that Mr. Schuster attributes to him. There is no dispute that the neuropsychological testing recommended by Dr. Dudley could have been done, and Dr. Dudley assumed that additional testing would be done prior to Petitioner's trial. (Federal Hearing Tr. at 105.)

### 2. Mental Health Evidence Regarding Brain Damage

#### a. Neurological Testing by Dr. Merikangas

Dr. James Merikangas, who specializes in neurology and psychology, evaluated Petitioner and concluded Petitioner suffers from a brain injury, which is likely localized to the right hemisphere in the frontal lobes of the brain. Dr. Merikangas relied on the following in reaching his conclusion: a comprehensive neurologic examination, affidavits of Petitioner's family members, medical records from Petitioner's childhood hospitalization following the accident, Petitioner's educational records, Petitioner's jail records, records of Dr. Dudley's psychological testing, and documentation by family members that Petitioner performed poorly in school, was withdrawn, suffered from frequent severe headaches, and had episodes of falling out or passing out. (Federal Hearing Tr. at 32–33.) Dr. Merikangas performed a series of tests that would both rule in different problems and rule out different problems, including brain injury. (Federal Hearing Tr. at 36.)

Dr. Merikangas's physical examination of Petitioner supported the brain injury diagnosis. (Federal Hearing Tr. at 40.) As an initial matter, Dr. Merikangas testified that the scar across Petitioner's head is a sign of trauma. (Federal Hearing Tr. at 30.) Medical records from Petitioner's hospitalization indicated that Petitioner had a huge laceration on his head and that he spent five days in the hospital having fevers. (Federal Hearing Tr. at 32.) Dr. Merikangas opined that Petitioner probably had a significant brain injury at the time of his hospitalization. (Federal Hearing Tr. at 32.) He mentioned Petitioner's head circumference was larger than average, sug-

gesting that he may have had some brain swelling as an infant and perhaps as a result of his trauma when his head was run over by the car. (Federal Hearing Tr. at 40.) In fact, Petitioner's head circumference places him in the 98th percentile. (Federal Hearing Tr. at 76.) Petitioner also had high blood pressure, which can affect brain function. (Federal Hearing Tr. at 34.) Petitioner had asymmetrical reflexes, which indicated he had some problems with the input or output of his central nervous system. (Federal Hearing Tr. at 34.) Petitioner had decreased sensitivity to a pinprick on both his left arm and leg, which could indicate a lot of different things, such as peripheral neuropathy, spinal cord injury, or brain injury. (Federal Hearing Tr. at 34, 69–70.) The result of that test, by itself, does not mean very much. (Federal Hearing Tr. at 70.) However, considering Petitioner's test results in totality, including the results of those tests administered by others and the other records provided to him for review, Dr. Merikangas opined Petitioner suffered from brain damage and that the brain damage was an acquired, post-traumatic type, as opposed to a birth defect. (Federal Hearing Tr. at 45.)

Dr. Merikangas reviewed Dr. Dudley's report concerning Petitioner and testified that Dr. Dudley's evaluation of Petitioner was just a basic psychological evaluation, not a neuropsychological evaluation. (Federal Hearing Tr. at 41.) As explained by Dr. Merikangas, the basic psychological evaluation focuses on personality and the questions of thought disorder, depression, or psychosis. (Federal Hearing Tr. at 41.) The neuropsychological evaluation, on the other hand, is designed to demonstrate, evaluate, and quantify brain damage. (Federal Hearing Tr. at 41.) Dr. Dudley's conclusions that he did not see any sociopathic, psychopathic, or passive-aggressive indication in his testing of Petitioner did not rule out brain injury. (Federal Hear-

ing Tr. at 41.) According to Dr. Merikangas, those results would tend to support abnormal behavior as being the result of brain injury rather than a personality problem. (Federal Hearing Tr. at 41.) Thus, Dr. Merikangas concurred that neuropsychological testing should have been performed to determine whether an organic etiology (i.e., brain damage) was present. (Federal Hearing Tr. at 41.)

Dr. Merikangas further testified regarding the large discrepancy between Petitioner' verbal and performance test scores, as recorded by Dr. Dudley when he examined Petitioner prior to trial. (Federal Hearing Tr. at 40–41.) According to Dr. Merikangas, a large discrepancy between performance, which concerns visual spatial things, and verbal, which concerns the ability to read, speak, and understand language, suggests the existence of some brain damage. (Federal Hearing Tr. at 40–41.)

Dr. Merikangas also reviewed the report of the neuropsychological testing later done by Dr. Price and explained that Dr. Price came to the conclusion that there was right hemisphere and frontal lobe brain damage. (Federal Hearing Tr. at 41.) Dr. Price administered a more extensive battery of tests, and his testing showed, among other things, a discrepancy between verbal and performance I.Q., just as Dr. Dudley had found with his testing. (Federal Hearing Tr. at 42.) As a neuropsychologist, Dr. Price quantified Petitioner's brain functions to give a catalog of performance, whereas Dr. Merikangas, as a neurologist, was equipped to use hands-on, physical testing to ascertain causes. (Federal Hearing Tr. at 42–43.)

As to the impact that brain injury may have on a person, Dr. Merikangas testified regarding several potential consequences:

Well, brain injury doesn't make you better. And it often causes people to be-

come short-tempered, irritable. Some suffer frequent headaches, which, of course, Mr. Jefferson was suffering from. You can have seizures. Epilepsy. But the most common thing with a closed head injury, traumatic injury of this sort, is problems with judgments, executive planning, and impulse control, the ability to foresee the consequences of your action in the future, as opposed to right now. There's the kind of an immediacy to the way people act. They are more likely to be short-tempered and do improper things.

(Federal Hearing Tr. at 45.) Dr. Merikangas further explained that the negatives associated with brain injury improve right after the injury, but then a person suffering from brain injury is likely to suffer from premature dementia or senility. (Federal Hearing Tr. at 46.)

Dr. Merikangas did not see evidence of Petitioner being short-tempered, temperamental, or having a history of issues with impulse control. (Federal Hearing Tr. at 74, 77). However, he testified that a person with brain damage could just have one instance of impulsive violence. (Federal Hearing Tr. at 74.) With respect to Petitioner, in particular, Dr. Merikangas emphasized that the absence of evidence of multiple instances of impulsive behavior may be due to Petitioner having been in a structured environment in the Navy and Petitioner having been in a structured environment in prison for the past 25 years. (Federal Hearing Tr. at 77.) Still, Dr. Merikangas did point out that Petitioner's prior criminal history in Kentucky could be further evidence of lack of executive control, and Dr. Merikangas testified that Petitioner's brain damage could explain Petitioner's behavior and testimony while under cross-examination during the sentencing phase of his trial. (Federal Hearing Tr. at 83, 84.)

Dr. Merikangas believes that Petitioner's brain injury would result in a reduced moral culpability. (Federal Hearing Tr. at 47.) He testified that people who cannot control their emotions due to brain injury have a physical problem with their nervous system, not a moral flaw. (Federal Hearing Tr. at 47.) While Petitioner denies he committed the crime of which he was convicted in this case, Dr. Merikangas testified that, assuming he did commit the crime, Petitioner might have hit the victim in this case, Ed Taulbee, over the head in a momentary fit of rage, which was not as controllable by someone who is impaired as it would be in a normal person. (Federal Hearing Tr. at 47–48.)

All of the testing and information that Dr. Merikangas relied upon in reaching his conclusions would have been available at the time of Petitioner's trial. (Federal Hearing Tr. at 48.)

#### b. Neuropsychological Testing by Dr. David Price

The neuropsychological testing that Dr. Dudley recommended in his report ultimately was conducted in 1991 by Dr. David Price, although Dr. Dudley testified he might have done a different variation of that testing. (Federal Hearing Tr. at 106.) Dr. Price was hired to make a differential diagnosis to investigate Petitioner's psychological and neuropsychological functioning. (Federal Hearing Tr. at 136.) Dr. Price met with Petitioner on two different days. (Federal Hearing Tr. at 137.) Prior to evaluating Petitioner, Dr. Price reviewed several documents, including, among other things, affidavits from Petitioner's family members, Petitioner's school and hospital records, and reports of others who performed mental health testing of Petitioner. (Federal Hearing Tr. at 138, 142.)

Dr. Price recalled a notation in the hospital records that Petitioner suffered a

head injury. (Federal Hearing Tr. at 138.) He also recalled Petitioner was hospitalized for five days, and he considered that a long hospitalization. (Federal Hearing Tr. at 140.) The period of hospitalization, in Dr. Price's opinion, indicated the injury was severe. (Federal Hearing Tr. at 140.)

Dr. Price noted the reports of Petitioner's family members concerning Petitioner's behavioral changes and physical condition following the accident. (Federal Hearing Tr. at 141.) Specifically, Dr. Price noted that the family reported Petitioner would cry because of headaches and had blackout spells where he would actually become unconscious. (Federal Hearing Tr. at 141, 170.)

Dr. Price made the personal observation that Petitioner had a "dramatic scar ... across his skull." (Federal Hearing Tr. at 138.) Dr. Price's testimony regarding this scar was the following:

> Well, as I have in my affidavit, it's a prominent scar that began mid ear along the left side of the skull progressing across the left temple and extending across the left side of the forehead, crossing the left frontal lobe and ending on the top of the right frontal lobe, running back to possibly the right hemisphere's primary motor strip.

(Federal Hearing Tr. at 138–39.) Dr. Price also commented "that it was prominent and resulted in cranial indentation and was very observable." (Federal Hearing Tr. at 139.) Dr. Price concluded that the scar and indentation were related to Petitioner's being hit by a car when he was two years of age. (Federal Hearing Tr. at 139.) Dr. Price also noticed that Petitioner's head was asymmetrical. (Federal Hearing Tr. at 139.)

Dr. Price testified that a brain injury in a two-year-old is much more significant than a brain injury for a thirty-year-old, for example. (Federal Hearing Tr. at 141.) When a two-year-old suffers a brain injury, that injury has the potential to alter cognitive development. (Federal Hearing Tr. at 141.) The injury could cause impairment in neurometabolic function, communication, and development of the frontal lobes. (Federal Hearing Tr. at 142.) Simply put, a brain injury for a two-year-old can be more significant than for an adult because the brain of a two-year-old is continuing to develop. (Federal Hearing Tr. at 142.)

Dr. Price testified about what he found significant from the testing conducted by Dr. Dudley. There was a significant difference between Petitioner's performance and verbal I.Q. scores, which Dr. Price testified can indicate a difference in performance of cerebral functioning. (Federal Hearing Tr. at 143.) When one hemisphere of the brain is operating more efficiently than the other, that would indicate something is going on organically or be evidence of some type of brain dysfunction. (Federal Hearing Tr. at 143–44.) Petitioner had a 14–point difference, and only five percent of the population or less have a spread of 15 points. (Federal Hearing Tr. at 144.) Thus, this caused Dr. Price concern and was something he planned to investigate. (Federal Hearing Tr. at 144.)

Several other things in Petitioner's records concerned Dr. Price. He noted that Petitioner's school records indicated Petitioner had an I.Q. of 65. (Federal Hearing Tr. at 145.) He recalled Petitioner's brother was diagnosed with paranoid schizophrenia and therefore wanted to look at whether Petitioner had a psychiatric diagnosis or personality disorder. (Federal Hearing Tr. at 145.) Dr. Price found no evidence of a personality disorder. (Federal Hearing Tr. at 145.)

Dr. Price administered a number of tests on Petitioner. (Federal Hearing Tr. at 146.) One of them was the Weschler Adult Intelligence Scale Revised, which

was an updated intellectual test. (Federal Hearing Tr. at 147.) Dr. Price also administered the Wide Range Achievement Test Revised. (Federal Hearing Tr. at 147.) He administered the Denman Neuropsychology Memory Scale, which measures a variety of memory abilities. (Federal Hearing Tr. at 148.) Dr. Price administered a couple of tests from the Halstead–Reitan Category Test, the Trails A and B, and the Luria–Nebraska Neuropsychological Battery. (Federal Hearing Tr. at 148.) All of these were state-of-the-art tests at the time in 1991. (Federal Hearing Tr. at 148–49.)

Dr. Price determined Petitioner had suffered a brain injury and had chronic organic dysfunction. (Federal Hearing Tr. at 155.) Dr. Price scored the Luria–Nebraska by hand and also sent it in to Western Psychological Services for a test report. (Federal Hearing Tr. at 150.) Both Dr. Price's scoring and the scoring by the Western Psychological Services indicated organic dysfunction. (Federal Hearing Tr. at 150.) On the Wide Range Achievement Test, Petitioner scored at a fourth grade level equivalency in spelling and a sixth grade equivalency in math, indicating Petitioner had not profited as much as one might have thought from 11th grade education, which could be a result of brain damage. (Federal Hearing Tr. at 155–56.) On the Denman Neuropsychology Memory Scale, Petitioner tested at the 14th percentile, which indicated the potential for some memory deficits or memory problems. (Federal Hearing Tr. at 156.)

Dr. Price ultimately diagnosed Petitioner as having frontal lobe brain damage caused by traumatic brain injury, but that diagnosis was not based just on Petitioner's test results. (Federal Hearing Tr. at 157.) Rather, the diagnosis was based also on Petitioner's known motor vehicle accident, which resulted in his hospitalization for five days, and two other head injuries Petitioner reported to Dr. Price. (Federal Hearing Tr. at 157, 182.) In concluding that Petitioner suffered damage to both cerebral hemispheres, Dr. Price considered the totality of the evidence, and Dr. Price has not seen anything since 1991 that would cause him to change his opinion on the diagnosis. (Federal Hearing Tr. at 157–58.)

This diagnosis, according to Dr. Price, would cause someone to have a problem with self-control. (Federal Hearing Tr. at 165.) This could mean inhibition, irritability, affect judgment, planning, understanding consequences, and things of that nature. (Federal Hearing Tr. at 165.) This does not mean that the person automatically becomes more aggressive. (Federal Hearing Tr. at 165.) With respect to Petitioner, in particular, Dr. Price noted that Petitioner's sentencing-phase testimony and his refusal to cooperate with Dr. Dudley on one occasion are evidence of what happens to Petitioner in novel, stressful situations and are consistent with a substantial loss of self-control. (Federal Hearing Tr. at 167.) Dr. Price also testified that Petitioner's drug-seeking behavior could be an indication of loss of control. (Federal Hearing Tr. at 168.) Petitioner's going AWOL while in the military a number of times also would be associated with impulsivity and poor judgment. (Federal Hearing Tr. at 181.)

Dr. Price further testified that a brain injury can cause problems that could be consistent with having a learning disability or deficits in concentration or attention. (Federal Hearing Tr. at 156, 169.) It is possible a person can have a learning disability and not have brain damage, but there must have been some alteration in the organic function to have the learning disability. (Federal Hearing Tr. at 177.) In Petitioner's case, Dr. Price believes the brain injury likely would be responsible for

the learning disability, but he did acknowledge that the learning disability might have developed without the brain injury. (Federal Hearing Tr. at 179.) Either way, Dr. Price testified that the brain injury did not help the learning disability. (Federal Hearing Tr. at 179.)

### c. Opinions of Respondent's Rebuttal Expert

Dr. Stephen Macciocchi, a neuropsychologist and research investigator, testified as a rebuttal expert on behalf of Respondent. (Federal Hearing Tr. at 184.) Dr. Macciocchi has no medical degree and has no expertise in neurology from a medical standpoint. (Federal Hearing Tr. at 188.) Dr. Macciocchi was asked to perform a neuropsychological evaluation of Petitioner. (Federal Hearing Tr. at 188.) He and Rachel Evans, his psychometrist, gave tests that looked at intellectual functioning, problem solving, executive skills, tension concentration, language, and memory. (Federal Hearing Tr. at 189.) Dr. Macciocchi also conducted an interview of Petitioner. (Federal Hearing Tr. at 189.) Dr. Macciocchi reported the results of his evaluation in a report. (Respondent's Ex. 1.) Also in the report, Dr. Macciocchi criticized various parts of Dr. Merikangas's and Dr. Prices's findings. (See Respondent's Ex. 1.)

Before evaluating Petitioner, Dr. Macciocchi received from Respondent's counsel medical records from Children's Hospital in Louisville, Kentucky, Dr. Dudley's report, Dr. Price's report, Dr. Merikangas's report, the depositions of Dr. Merikangas and Dr. Price, transcripts from Central High School in Louisville, Kentucky, and various documents from the Georgia Diagnostic and Classification Center. (Respondent's Ex. 1 at 1.) Dr. Macciocchi also had read affidavits of Petitioner's family members, but he did not get a copy of Petitioner's criminal history until after the fact. (Federal Hearing Tr. at 190.) Dr. Macciocchi testified he did not know anything about Petitioner's background before he saw him or the charges against him. (Federal Hearing Tr. at 190.)

Dr. Macciocchi took several different tests with him for Petitioner's evaluation but did not decide which tests he would use until he met with Petitioner. (Federal Hearing Tr. at 191–92.) Dr. Macciocchi acknowledged that experts often have conflicting opinions on which tests should be given. (Federal Hearing Tr. at 197.) Dr. Macciocchi gave the tests he thought had the highest reliability and explained why he did not use some of the tests that Dr. Merikangas thought he should have used. (Federal Hearing Tr. at 195–97.)

With respect to performance validity, Dr. Macciocchi testified Petitioner did not attempt to appear impaired. (Federal Hearing Tr. at 200.) Petitioner tried on the tests that were administered and, in Dr. Macciocchi's words, "his effort was not so optimal." (Federal Hearing Tr. at 200.) According to Dr. Macciocchi, such a result increases the confidence in the test findings. (Federal Hearing Tr. at 200.)

On the intelligence test, Dr. Macciocchi evaluated Petitioner's overall I.Q. to be 93, which is average. (Federal Hearing Tr. at 201.) He noted a 16-point scatter between his performance and verbal scores, (Federal Hearing Tr. at 201), which is similar to the results obtained by Petitioner's mental health experts. However, Dr. Dudley found the opposite pattern. (Federal Hearing Tr. at 201). Regardless, Dr. Macciocchi is of the opinion that a difference in verbal and performance I.Q., whichever direction it is, is not indicative of brain injury. (Federal Hearing Tr. at 201, 244.) Dr. Macciocchi asserts that such a scatter can occur in normal populations and that it can change, (Federal Hearing Tr. at 201.) Further, he reasoned that the increase in the scatter for Petitioner was due to his aging. (Fed-

eral Hearing Tr. at 202.) Dr. Macciocchi did acknowledge that if such a scatter had been detected 25 years ago, experts would have said the scatter was indicative of brain dysfunction. (Federal Hearing Tr. at 201.)

On the four executive functioning tests, Petitioner's performance varied. On the Wisconsin Card Sorting Test, Petitioner's performance was low average. (Federal Hearing Tr. at 202.) On the trail-making test, which is a test focusing on attention, Petitioner's scored in the average range. (Federal Hearing Tr. at 202.) Petitioner's verbal fluency was high average to average, and his working memory was average. (Federal Hearing Tr. at 202.) Dr. Macciocchi's overall conclusion with respect to the executive functioning area was that Petitioner was between low average and average. (Federal Hearing Tr. at 203.)

Dr. Macciocchi reported on several other areas and concluded, looking at the total test battery, that Petitioner does not have psychometrically-reliable impairment. (Federal Hearing Tr. at 203.) Petitioner had average processing speed in attention. (Federal Hearing Tr. at 203.) Concerning language function, Petitioner had superior naming skills. (Federal Hearing Tr. at 203.) His visual perceptional functioning and sensory motor functioning were fine. (Federal Hearing Tr. at 203.) Dr. Macciocchi did not find any lateralized impairment in sensory motor functioning. (Federal Hearing Tr. at 203.) Petitioner had no dysgraphesthesia or finger agnoisa lateralized. (Federal Hearing Tr. at 203.) Petitioner had normal fine motor speed in dexterity bilaterally. (Federal Hearing Tr. at 203.) His memory function was low average to average, and his verbal learning was solidly average. (Federal Hearing Tr. at 203.)

Notably, Dr. Macciocchi used demographic norms for many of his tests, whereas Dr. Price used the norms provided by the manufacturers. (Federal Hearing Tr. at 150–51, 193, 206.) The norms used by Dr. Macciocchi often are referred to as the "Heaton Norms." These norms were not available when Dr. Price evaluated Petitioner in March of 1991. (Federal Hearing Tr. at 152, 237.) The original version of the Heaton Norms came out later in 1991, but they still were not readily used right away. (Federal Hearing Tr. at 152, 237.) There was a revision to the norms, which was published in 2004, (Federal Hearing Tr. at 152), and it was the revised norms that Dr. Macciocchi used, (Federal Hearing Tr. at 237). Thus, the Heaton adjustments or norms that Dr. Macciocchi used to score several of the tests he performed on Petitioner would not have been used back in 1986, as they were not available. (Federal Hearing Tr. at 237–38.)

The Heaton Norms are demographically corrected or adjusted and take into account such factors as race, age, gender, and educational level, comparing the subject of the evaluation to only those people who fall into similar categories, rather than the general population. (Federal Hearing Tr. at 152–53, 193.) The Heaton Norms assume the individual being tested had a normal development, education, and life span. (Federal Hearing Tr. at 153.) This presents a problem in cases like that of Petitioner, where the individual being tested previously had a known head injury. (Federal Hearing Tr. at 153–54.) As Dr. Price testified, the developers of the Heaton Norms have since recommended that demographic corrections not be used in cases like this, where there is a known head injury. (Federal Hearing Tr. at 154, 177.) In a book published by Igor Grant and Keith Adams in 2009, Mr. Heaton, Dr. Grant, and Dr. Ryan wrote a chapter on demographic influences in neuropsychological assessment. (Federal Hearing Tr. at 155.) In this chapter, they write:

It is generally understood that demographically corrected normative standards are based upon performances of adults who have developed normally, have typical, mainstream educational backgrounds, and have no known history of brain injury or disease. It follows logically from this that such norms should be used with great caution, if at all, to identify acquired brain dysfunction in patients who have developmental disorders or other-than-mainstream educational backgrounds (e.g., special education). For example, it would be inappropriate to adjust a mentally retarded person's IQ upward because of a low education level, thereby potentially depriving him/her of social services or mitigating considerations in criminal prosecution.

As we have noted, demographically corrected norms are used primarily to identify the presence and nature of neurobehavioral *changes* due to known or possible brain insult (injury or disease). Such norms are generally not the best choice for characterizing the individual's *absolute* level of functioning, or functioning in relation to the general population of normal adults (Heaton & Pendleton, 1981). For the latter, we recommend norms that compare the individual's test performance with results of a sample that conforms as closely as possible to census characteristics. For example, with the Heaton et al. (2004) norms for the expanded HRB, uncorrected scaled scores (not demograph-ically corrected T–scores) would be best suited for this purpose.

Robert Heaton, Lee Ryan & Igor Grant, "Demographic Influences and Use of Demographically Corrected Norms in Neuropsychological Assessment," in <u>Neuropsychological Assessment of Neuropsychiatric and Neuromedical Disorders</u> 147 (3d ed., 2009). Hence, the authors of the norms used by Dr. Macciocchi on several of the tests he administered have stated that using those norms in a case where there is a known history of brain injury (e.g., having one's head run over by a car at the age of two) is not appropriate. Dr. Macciocchi testified that he found it hard to believe that would be their recommendation, but he admitted that he had not read the literature upon which Dr. Price was relying and therefore could not comment. (Federal Hearing Tr. at 193–94, 247–48.)

In addition to administering tests, Dr. Macciocchi conducted an interview of Petitioner with the purpose of looking at whether Petitioner exhibited any disinhibitory aggressive behavior towards others, which would support a diagnosis of lifelong frontal lobe disorder. (Federal Hearing Tr. at 209.) He talked to Petitioner about many different topics and determined he did not. (Federal Hearing Tr. at 209.) Dr. Macciocchi acknowledged Petitioner may have had some episodes of disinhibition in his life and exercised poor judgment at times, but he did not see a history of aggressive behavior towards others systematically.[10] (Federal Hearing Tr. at 209–

---

10. Dr. Macciocchi and Dr. Price fundamentally disagree about whether a person with frontal lobe problems necessarily becomes aggressive and whether that aggressive behavior would be systematic. According to Dr. Price, a person diagnosed with a frontal lobe problem might become aggressive; however, aggression is not an automatic effect. (Federal Hearing Tr. at 165.) He explained that the effects of a frontal lobe problem might be expressed differently, depending upon the person and that person's environmental circumstances. (Federal Hearing Tr. at 165–66.) Dr. Macciocchi seems to reject the notion that a person with frontal lobe problems might occasionally exhibit aggressive behavior. Instead, he posits that this behavior would be observed systematically. (Federal Hearing Tr. at 209–212, 222–23, 234–35, 253.)

212, 222–23, 234–35, 253.) Thus, Dr. Macciocchi concluded from the interview that Petitioner does not have a lifelong frontal lobe problem, (Federal Hearing Tr. at 209), but he could not say that Petitioner did not have a brain injury, (Federal Hearing Tr. at 212).

Dr. Macciocchi ultimately concluded that Petitioner has an alcohol use disorder that is in remission and a learning disorder. (Federal Hearing Tr. at 213.) Dr. Macciocchi bases the finding of a learning disorder not on his own testing but on other people's testing indicating that Petitioner has impaired academic skills relative to his intelligence. (Federal Hearing Tr. at 213.) However, because Petitioner's academic achievement is below his I.Q., he believes a diagnosis of a learning disability is a plausible diagnosis. (Federal Hearing Tr. at 213–14.) According to Dr. Macciocchi, a person could have learning problems from a brain injury, but he does not believe learning disabilities are related to brain disease or trauma. (Federal Hearing Tr. at 214, 249–50.)

Regarding Petitioner's injury at age two, Dr. Macciocchi opined that the injury did not cause moderate to severe brain damage, which would result in a lifelong, persisting inability to function behaviorally and cognitively, but he stated it was possible Petitioner had a mild or a mild, complicated brain injury. (Federal Hearing Tr. at 216.) What Dr. Macciocchi observed from the medical records of Petitioner's hospitalization was that there was no documentation that Petitioner was in a coma, that he had protracted lethargy or inability to respond, that he had abnormal reflexes, or that his pupils were abnormal. (Federal Hearing Tr. at 216.) Dr. Macciocchi also noted Petitioner did not have a fractured skull. (Federal Hearing Tr. at 216.) Dr. Macciocchi acknowledged that neurological science was limited at the time of Petitioner's accident and hospitalization. (Federal Hearing Tr. at 215–16.) For example, they did not have C.T. scans or anything they could use to get an image of Petitioner's brain. (Federal Hearing Tr. at 216.) However, he still expected that he would see in the medical records a description of symptoms experienced by Petitioner that would be consistent with brain damage, if Petitioner sustained a brain injury. (Federal Hearing Tr. at 254.) Dr. Macciocchi could not state one way or the other whether Petitioner's five-day hospitalization was itself significant, as he surmised that the reasons Petitioner was kept in the hospital could be so varied in nature. (Federal Hearing Tr. at 216–17.)

To the extent that Dr. Macciocchi dismisses the possibility that Petitioner sustained a serious brain injury at the age of two due to a mental status examination not being performed when Petitioner was in the hospital, Dr. Price offers a reasonable explanation for such an examination not being done. Dr. Price testified it would be difficult to recognize changes in cognition due to an injury on a two-year-old. (Federal Hearing Tr. at 140.) Due simply to the developmental stage of a two-year-old, there would not be much "sophisticated behavior to observe or rate." (Federal Hearing Tr. at 141.) Dr. Price "would not expect a wide documentation of poor concentration, altered verbal memory, things like that, from a two-year-old that's had a brain injury." (Federal Hearing Tr. at 170.) Further, medical staff, having only observed Petitioner for five days while he likely was under sedation, would not have had the familiarity with Petitioner or the breadth of experiences with Petitioner to determine if there were significant changes in his cognition or behavior. (Federal Hearing Tr. at 180.) Petitioner's family, on the other hand, had the experience and knowledge to determine if anything changed after the accident, and they attested to such changes (e.g., chronic head-

aches, fainting, dizziness, blurred vision, and withdrawal) in the affidavits that Dr. Price and Dr. Merikangas relied upon, in part, in reaching their conclusions. (Petitioner's Ex. 8; Federal Hearing Tr. at 32, 141.)

Dr. Macciocchi does believe Petitioner has "impairment in his ability in his executive skills[,]" but he did not see evidence of a pervasive frontal lobe disorder that would prevent Petitioner from controlling his behavior. (Federal Hearing Tr. at 220–21.) Dr. Macciocchi does not attribute the observed lapses in Petitioner's judgment to frontal lobe problems. (Federal Hearing Tr. at 221.) Dr. Macciocchi did not see a history of evidence that Petitioner behaved in a manner that was consistent with frontal lobe damage, which affected his aggression and loss of self-control. (Federal Hearing Tr. at 222.)

Dr. Macciocchi explained that getting some impaired test scores does not necessarily mean that a person has brain damage. (Federal Hearing Tr. at 205.) He critiqued Dr. Price for asserting that impaired scores on neuropsychological tests could be used to diagnose frontal brain damage definitively without definitive, corroborative evidence of cerebral trauma. (Respondent's Ex. 1 at 4.) However, the definitive, corroborative evidence, according to Dr. Price, was the scar across Petitioner's skull and the known accident where Petitioner's head was run over by a car, which required Petitioner to be hospitalized for five days. (Federal Hearing Tr. at 157.) Thus, Dr. Price did not diagnose Petitioner's frontal lobe brain damage just from Petitioner's test scores. (Federal Hearing Tr. at 157.)

Dr. Macciocchi generally criticized all of Petitioner's experts for not considering alternative explanations for the things they learned about and observed concerning Petitioner. (Federal Hearing Tr. at 231–33, 251–52.) Dr. Macciocchi disagreed with

Dr. Price's opinion, for example, that Petitioner's behavior with Dr. Dudley was indicative of frontal lobe brain damage. (Federal Hearing Tr. at 217–18.) He testified there could be a range of explanations for Petitioner's failure to cooperate with Dr. Dudley on that particular day, and he expressed his opinion that it is not uncommon for people in correctional settings to get angry with examiners. (Federal Hearing Tr. at 218.) Dr. Macciocchi simply did not believe Petitioner's lack of cooperation was an exemplar of disexecutive frontal lobe disorder. (Federal Hearing Tr. at 218.) Dr. Macciocchi likewise generally took issue with the diagnosis of frontal lobe disorder by Dr. Price and Dr. Merikangas on the basis that Petitioner did not display more impulsive behaviors over a sustained period of time. (Federal Hearing Tr. at 218, 220, 234.)

In his expert report, Dr. Macciocchi critiqued Dr. Merikangas for using subjective interpretive methods when he conducted his evaluation of Petitioner. (Respondent's Ex. 1 at 4; Federal Hearing Tr. at 197.) However, he testified at the evidentiary hearing that he was merely pointing out that, because it is a clinical examination, it was not a test that actually has standardized administration and norms. (Federal Hearing Tr. at 199.) Dr. Macciocchi is not a neurologist or a medical doctor. (Federal Hearing Tr. at 49, 187–88.) He conceded he would defer to a neurologist and clarified that the comment in the report was not meant to be disparaging. (Federal Hearing Tr. at 197.) Moreover, Dr. Merikangas testified that the physical examination he performed had many objective components and that such neurological examinations have survived Daubert scrutiny. (Federal Hearing Tr. at 49.) Dr. Macciocchi conceded that it takes a person with a medical degree and decades of experience examining people with brain injury to make sense of a person's reactions to

tests like those performed on Petitioner by Dr. Merikangas. (Federal Hearing Tr. at 225.)

Dr. Macciocchi also points to the absence of a skull fracture to support his conclusion that there is no moderate to severe brain injury. (Federal Hearing Tr. at 216, 228.) As verified by Dr. Merikangas and Dr. Price, however, there are many people who suffer from brain damage with closed-head injury. (Federal Hearing Tr. at 53, 139.) Football players, for example, often suffer from brain injuries that occurred while they were wearing helmets and with no skull fracture. (Federal Hearing Tr. at 53.) Dr. Merikangas testified that some brain damage can result in death, even with no fracture. (Federal Hearing Tr. at 53.) Dr. Price testified that the majority of brain injuries – meaning 85 to 90 percent – do not have skull fractures. (Federal Hearing Tr. at 139.) Dr. Macciocchi conceded that one does not have to have a skull fracture to have a brain injury. (Federal Hearing Tr. at 226.)

Dr. Macciocchi also discounts the conclusion of brain injury due to Petitioner's ability to conform his conduct to requirements in structured environments, such as the Navy and in prison. (Federal Hearing Tr. at 222.) However, Dr. Merikangas and Dr. Price testified that structured settings with rules are ideal for people with brain damage. (Federal Hearing Tr. at 47, 50, 180.) Dr. Price explained: "Well, one of the reasons for that is it makes their environment predictable so they don't have to solve any novel situations or have any novel stressors. It also restricts them from the consequences of their likely associated poor judgment." (Federal Hearing Tr. at 180.)

Further, Dr. Macciocchi's own observations of Petitioner's behavior and his ability to stand up to stress during the testing does not discount the possibility of brain injury. (Federal Hearing Tr. at 51–52.) Dr.

Merikangas explained that there was no indication that Dr. Macciocchi did or said anything to provoke Petitioner. (Federal Hearing Tr. at 52.) Thus, the fact that Petitioner was able to get along with his lawyers and with Dr. Macciocchi is not determinative of an absence of brain injury. (Federal Hearing Tr. at 52.)

A problem throughout Dr. Macciocchi's opinions is he points to evidence or the absence thereof and utilizes testing methods that would not have existed at the relevant time periods in this case to negate the diagnosis of frontal lobe disorder by Dr. Price and Dr. Merikangas. In this regard, Dr. Macciocchi makes much of the absence of evidence in Petitioner's hospital medical records to support his conclusion that Petitioner did not suffer from moderate to severe brain injury, but much of the evidence he mentions is not evidence that would have existed in 1957 when Petitioner sustained the head injury. For example, Dr. Macciocchi mentions the Glasgow Coma Scale, but the Glasgow Coma Scale did not even come into existence until 1974. (Federal Hearing Tr. at 228–29, 253–54.) Additionally, Dr. Macciocchi relies heavily on the Heaton Norms to criticize Dr. Price's opinions, but those norms were not available either in 1986 or in 1991 when Dr. Price conducted his evaluation of Petitioner. (Federal Hearing Tr. at 237–38, 243.) Dr. Macciocchi mentions that Dr. Price has no extensive record of Petitioner exhibiting impulsive behaviors. However, the records that might have shed light on Petitioner's impulsive behaviors, such as Petitioner's prison records, would not have been available in 1986 during Petitioner's trial. (Federal Hearing Tr. at 237.)

Importantly, Dr. Macciocchi's report did not in any way cause Dr. Merikangas or Dr. Price to doubt the conclusions they reached based upon information available to them that Petitioner is suffering from a

brain injury. (Federal Hearing Tr. at 55, 157–58.)

## B. Legal Analysis

This Court previously granted habeas corpus relief to Petitioner, presuming the state habeas court's factual findings to be true, on the basis that trial counsel had provided ineffective assistance of counsel at sentencing by failing to properly investigate and pursue evidence that Petitioner suffered from organic brain damage. Jefferson, 490 F.Supp.2d 1261 (N.D. Ga. 2007). Notwithstanding the Eleventh Circuit's reversal of this Court's ruling and the United States Supreme Court's subsequent decision to vacate the Eleventh Circuit's judgment, the analytical framework that this Court applied in its prior Order to evaluate Petitioner's ineffective assistance of counsel claim still applies. See Jefferson, 490 F.Supp.2d at 1299–1300, 1318–28. Indeed, the facts this Court has found upon de novo review of the claim give further support to this Court's conclusion that Petitioner's trial counsel rendered ineffective assistance when they abandoned the investigation into Petitioner's organic brain damage and failed to present mitigating mental health evidence during Petitioner's sentencing proceeding. Thus, the analysis below incorporates much of the Court's prior analysis of Petitioner's ineffective assistance of counsel claim.

■ To show that his right to effective assistance of counsel was violated, Petitioner must satisfy two components:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that

counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■ To establish that counsel was deficient, Petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Id at 688. An ineffective assistance of counsel claim is reviewed from the perspective of defense counsel based on facts "as they were known to counsel *at the time of the representation.*" United States v. Teague, 953 F.2d 1525, 1535 (11th Cir. 1992) (emphasis in original). "Courts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.' " Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052). To show deficient performance, Petitioner must establish that no competent lawyer would have taken the action his lawyer took. Chandler, 218 F.3d at 1315; accord Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994) ("Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so.").

■ To establish prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of

aggravating and mitigating circumstances did not warrant death." Id. at 695. In this case, confidence in the outcome is undermined if there is a reasonable probability that, had the mitigating evidence been presented, at least one juror would have struck a different balance.[11] Wiggins v. Smith, 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In making a determination with respect to this prejudice prong, the court must "consider the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding–and reweigh it against the evidence in aggravation." Porter v. McCollum, 558 U.S. 30, 41, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (quotation omitted and alteration adopted).

### 1. Ineffective Assistance

 The United States Court of Appeals for the Eleventh Circuit has held that although no absolute duty exists to investigate particular facts or a certain defense, "in preparing for a death penalty case, 'an attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.'" Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001) (quoting Porter v. Singletary, 14 F.3d 554, 557 (11th Cir. 1994)). The Supreme Court has explained the requisite analysis of an attorney's performance in this regard as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent

that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690–691, 104 S.Ct. 2052; accord Knowles v. Mirzayance, 556 U.S. 111, 123–24, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009). "[C]ounsel is not required to investigate and present all mitigating evidence in order to be reasonable." Grayson, 257 F.3d at 1225 (citing Tarver v. Hopper, 169 F.3d 710, 715 (11th Cir. 1999)). Reasonableness is assessed by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." Strickland, 466 U.S. at 688, 104 S.Ct. 2052.

 What investigations are reasonable "may be determined or substantially influenced by the defendant's own statements or actions." Id. at 691. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Id.

 When determining whether trial counsel conducted a reasonable investigation, the Court must undertake a multi-part inquiry. First, "it must be determined whether a *reasonable investigation* should have uncovered the mitigating evidence. If so, then a determination must be

11. Georgia law is clear that unless the jury unanimously votes to impose a death sentence, the court must impose a sentence of life without parole. See O.C.G.A. § 17-10-31(c). ("If the jury is unable to reach a unani- mous verdict as to sentence, the judge shall dismiss the jury and shall impose a sentence of either life imprisonment or imprisonment for life without parole.").

made whether the failure to put this evidence before the jury was a *tactical choice* by trial counsel." Blanco v. Singletary, 943 F.2d 1477, 1500 (11th Cir. 1991) (quoting Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir. 1988) (emphasis in original)). If the decision is tactical or strategic, that decision is afforded a "strong presumption of correctness." Blanco, 943 F.2d at 1500. Otherwise, the court must make a harmlessness review "to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Middleton, 849 F.2d at 493. The question of whether a decision was a strategic decision is a question of fact. Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991); see also 28 U.S.C. § 2254(d). However, whether the strategy was reasonable is a question of law subject to de novo review. Horton, 941 F.2d at 1462.

 Applying the above standards, the Court concludes that Petitioner's trial counsel provided ineffective assistance at sentencing by failing to conduct a reasonable investigation of mitigating evidence and by failing, in particular, to pursue evidence that Petitioner possibly suffered from brain damage.

### a. What a Reasonable Investigation Should Have Uncovered

As an initial matter, had Petitioner's trial counsel not abandoned their investigation of Petitioner's mental health prematurely, they should have and would have become aware of Petitioner's brain damage. In regard to what counsel would have discovered with further reasonable investigation, including specifically a neuropsychological evaluation, there are affidavits and live testimony from several mental health professionals providing relevant evidence. The Court has discussed this evidence in detail above. However, to reiterate, the Court summarizes Petition-er's experts' findings, as stated in this Court's prior Order:

Dr. James R. Merikangas ... determined that Petitioner suffers from permanent brain damage of the acquired, post-traumatic type, which is most pronounced in the right hemisphere of the brain, including the frontal lobe. (R. Ex. 40 at 236, 253–57, 319.) Dr. Merikangas further determined that his conclusions were consistent with those contained in Dr. Dudley's report. (Id. at 256.) More specifically, Dr. Merikangas reasoned that, in all probability, the attention deficit disorder and learning disability noted in Dr. Dudley's report are consequences of the severe trauma that Petitioner suffered to his head during childhood. (Id. at 256–57.) Another licensed clinical psychologist, Dr. Price, reached conclusions consistent with those of Dr. Merikangas. Dr. Price interviewed and examined Petitioner on March 22 and 26, 1991. Dr. Price determined that Petitioner has long suffered from frontal lobe syndrome or brain damage, which causes abnormal behavior in Petitioner over which he has no or substantially limited control. (R. Ex. 40 at 335.) Dr. Price opines that the significant difference between Petitioner's Verbal and Performance I.Q.s, which was noted by Dr. Dudley, indicated some differences in hemispheric integrity, which is characteristic of brain damage. (Id. at 340.) Dr. Price also referred to standard medical sources to support his findings and conclusions:

As stated in DSM–III–R, describing the Frontal Lobe Syndrome as reviewed from the ICD–9–CM Classification: "Conscientiousness and powers of concentration are often diminished, but measurable deterioration of intellect or memory is not necessarily present. The overall picture is often one of emotional dull-

ness, lack of drive and slowness; but particularly in persons previously with energetic, restless or aggressive characteristics, there may be a change toward impulsiveness, boastfulness, temper outbursts, silly fatuous humor, and the development of unrealistic ambitions." The tragedy of such brain damage is that the behavior that may result from it could, without the administration of proper testing, be mistaken for volitional.

(Id. at 343–44.) Dr. Dudley, having had an opportunity to review Dr. Price's findings, concurred with Dr. Merikangas and Dr. Price that Petitioner suffers from organic brain damage, presuming the test results of the tests performed by Dr. Price are correct. (R. Ex. 40 at 325.) Significantly, it is undisputed that the testing performed by Dr. Merikangas and Dr. Price could have easily been performed by available mental-health professionals in the Atlanta area prior to Petitioner's sentencing.16 (R. Ex. 40 at 259 ¶ 10, 322, 439 ¶ ¶ 3, 7.)

Jefferson, 490 F.Supp.2d at 1321–22.

In addition to the testimony of the mental health professionals, Petitioner also has presented affidavits from several of his family members and friends, which lend support to the experts' conclusions that Petitioner suffers from organic brain damage as a result of the childhood injury to his head. Trial counsel ultimately interviewed several of Petitioner's family members about a week before trial, but much of the testimony from Petitioner's family members relevant to his mental health was not uncovered by trial counsel but by Petitioner's habeas counsel. Significantly, however, trial counsel easily could have obtained this information prior to trial. As pointed out by this Court previously:

[H]ad trial counsel paid attention to obvious information concerning Jefferson's childhood injury, developed questions concerning the injury as a part of their background investigation of Jefferson, and contacted the family members and friends of Jefferson earlier in the case, counsel likely would have learned critical information about the head injury and the medical problems that Jefferson had as a child. The May 8, 1985 "Health History" from the Cobb County jail, composed almost a year prior to the trial in this case, noted that Petitioner suffered a head injury years ago and that he had frequent headaches as a result of the head injury. (R. Ex. 40 at 369.) Trial counsel apparently failed to pay attention to the "Health History." (R. Ex. 39 at 37–38, 40–41, 205.) In addition, the written summary of Petitioner's statement to the police makes reference to the fact that Petitioner was hit by an automobile when he was a child. (R. Ex. 40 at 370.) Yet, counsel, who actually utilized the statement during a pre-trial hearing, failed to follow up on this critical information. Petitioner also had a visible scar on his forehead. This also was ignored.

Jefferson, 490 F.Supp.2d at 1322–23.

The information that trial counsel would have learned from Petitioner's family would have provided compelling evidence supporting a diagnosis of brain damage:

Had trial counsel taken care to notice and follow up on the information and scar, trial counsel would have learned from Petitioner's mother that Jefferson stayed in the hospital for a long time after he suffered the head injury and that he had heavy fevers the whole time. (Id. at 355.) Trial counsel also would have learned from her that Jefferson kept to himself as a child, that he was slower than others to pick up on things, and that he often had problems paying attention and concentrating on his work.

(Id. at 356.) Vera Jefferson also indicates in her affidavit that Jefferson eventually started getting headaches regularly and that she worried about him driving because he got dizzy and his sight got blurry sometimes. (Id.) Petitioner's older brother, James Jefferson, whom trial counsel never contacted before trial, would have informed them that Petitioner used to sweat all the time, even during the winter. (Id. at 349.) Consistent with his mother, he also would have advised trial counsel that Petitioner kept to himself, had bad headaches as a child, and often experienced dizziness. (Id. at 350.) He further would have informed counsel that Jefferson occasionally would faint and that he had one time been hospitalized after fainting. (Id.) Significantly, counsel also would have learned that Jefferson had a history of mental illness in his family. (Id. at 351.) This information would have itself been additional mitigating evidence and likely would have prompted trial counsel to expand the scope of their mental health investigation, particularly if trial counsel had provided the information to Dr. Dudley prior to his mental evaluation of Petitioner.

Jefferson, 490 F.Supp.2d at 1323.

In sum, a reasonable investigation in this case should have and likely would have uncovered evidence that Petitioner has long suffered from organic brain damage. However, trial counsel did not notice or attribute much significance to the information about Petitioner's head injury, did not contact Petitioner's family members to perform a background investigation until after their mental health investigation was complete, and abandoned the mental health investigation without having any neuropsychological evaluation of Petitioner performed. Especially given this Court's finding that Dr. Dudley never rescinded his recommendation that a neuropsychological evaluation be performed to rule out

brain damage, Petitioner's trial counsel were woefully deficient.

### b. Whether Trial Counsel Made a Tactical Decision

Respondent characterizes the decision of Petitioner's trial counsel not to investigate Petitioner's mental health further and not to present mental health evidence during the sentencing phase of trial as a strategic decision, but the Court takes issue with that characterization and the reasonableness of that decision. First, the decision not to investigate further was contrary to Dr. Dudley's unambiguous written recommendation that it would be worthwhile to conduct neuropsychological testing to rule out brain damage. Second, the decision was without due regard for information known by counsel that Petitioner had suffered a serious head injury. Third, the decision not to investigate further was erroneously based on counsel's failure to inquire about and appreciate the potential value of evidence of brain damage as a mitigating circumstance. Fourth, the decision not to present mental health evidence can hardly be described as strategic, since trial counsel was not aware of the mental health evidence that might have been available. Fifth, a mere investigation into whether Petitioner suffered from brain damage would not have precluded Petitioner's trial attorneys from proceeding with the residual doubt defense. Sixth, as Judge Edward Carnes explained in his dissenting opinion when this case was before the Eleventh Circuit, Petitioner's trial counsel did not actually present a residual doubt defense during the penalty phase of Petitioner's trial.

Dr. Dudley expressly and unambiguously recommended that neuropsychological testing be conducted to rule out organic etiology. While this recommendation is mentioned only briefly and in the concluding sentences of Dr. Dudley's report, Dr.

Dudley was limited in his ability to expound much further or make a discussion of this possibility a central part of his report. The very reason for the recommendation was to explore a possible condition that he had not been able to investigate previously. As mentioned above, there was an abundance of information that would have supported Dr. Dudley's concern regarding the possibility of brain damage, but Petitioner's trial attorneys either did not provide the information to Dr. Dudley or did not learn of the information themselves until after Dr. Dudley completed his evaluation and report. Even without this information, Dr. Dudley made an unqualified recommendation that additional testing be conducted. This distinguishes the case at bar from Housel v. Head, 238 F.3d 1289 (11th Cir. 2001), relied upon by Respondent, as trial counsel's decision in that case not to develop psychological evidence in mitigation or defense was deemed reasonable, in part, because neither of the psychological evaluations that already had been performed "offered any encouragement to proceed further." Id. at 1296. That is not the case here. Admittedly not mental health experts themselves, Petitioner's trial counsel unfathomably failed to act upon the recommendation of the individual they hired to provide opinions and recommendations based on his mental health expertise. None of the other conclusions and observations included in the report undermined Dr. Dudley's recommendation that counsel investigate the possible presence of brain damage, which Dr. Dudley had been unable to explore. Dr. Dudley was the mental health expert, and this was his concluding recommendation, notwithstanding the other findings and opinions set forth in the report. Petitioner's trial counsel acted unreasonably and ineffectively when they dismissed the recommendation so casually.

By not pursuing neuropsychological testing, Petitioner's trial counsel essentially decided to ignore information about which they were aware that suggested a possible brain injury or some other mental impairment. First, Petitioner's attorneys knew that Petitioner's head had been run over by a car at the age of two. Second, Petitioner's trial counsel were on notice, having been made aware of Petitioner's odd interaction with Dr. Dudley during one of Dr. Dudley's visits to the jail, that Petitioner sometimes exhibited impulsive, uncooperative behavior. Judge Carnes, in his dissenting opinion, recognized the problematic nature of trial counsel's failure to appreciate the significance of Petitioner's impulsive behavior during Dr. Dudley's continued evaluation:

> That Jefferson was helpful and always cooperated in building a defense is not inconsistent with brain damage. The statement that Jefferson "was 'always very calm and always extremely helpful'" overlooks the part of Dr. Dudley's report about what happened when he went to the jail to continue with testing that he had begun the day before: "Mr. Jefferson became agitated and disorganized in his behavior, berating me for not having made an appointment with him, and insisting that I come back another day. I discussed with him the possibility that his failure to cooperate would not be in his best interests, but he was adamant in refusing to work with me at that time." Jefferson later explained to Dr. Dudley, "I get that way sometimes, man." [Respondent's Ex. 40: 372]

Jefferson, 570 F.3d at 1319 n. 5 (Carnes, J., dissenting). Thus, even though trial counsel's own interactions with Petitioner did not alert them to potential mental health issues, Mr. Cella and Mr. Schuster were aware of Petitioner's own statement to Dr. Dudley suggesting that he occasionally exhibited odd, uncooperative, and testy behavior. This information, too, should

have alerted trial counsel to the presence of a potential mental health issue deserving further evaluation, especially since Petitioner's behavior in this instance was so uncharacteristic of what they had come to understand as his normal behavior. Trial counsel's decision to ignore the information instead and limit their investigation was not supported by reasonable professional judgment. See Ford v. Hall, 546 F.3d 1326, 1333–34 (11th Cir. 2008) (holding that in evaluating the reasonableness of an investigation into mitigating circumstances "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further").

Petitioner's trial counsel also failed to appreciate the purpose of neuropsychological testing and the value of brain-damage evidence. As an initial matter, counsel unreasonably limited their mental health inquiry to what they perceived as the three "standard" mental health defenses (i.e., competency at the time of the crime, at the time of trial, or mental retardation). Trial counsel testified that one of the reasons they did not call Dr. Dudley as a witness for the defense was based on Dr. Dudley's conclusion that Petitioner's mental deficiencies did not prevent him from understanding right from wrong, did not impair his judgment or his decision-making capabilities, and that he was non-psychotic. Dr. Dudley's conclusions in this regard, however, do not speak to the existence or non-existence of mitigating mental health evidence pertinent to the penalty phase of trial. Mr. Schuster also had fundamental misconceptions about neuropsychological testing and brain-damage. In this respect, counsel was asked several times at the hearing before the state habeas corpus court why neuropsychological testing was not pursued. In response, Mr. Schuster stated that the testing was not pursued because Dr. Dudley had decided that exploration of explosive personality disorder was unnecessary. (Respondent's Ex. 39 at 175–76.) Mr. Schuster also stated that in his and Mr. Cella's dealings with Petitioner, they had not become aware of any problems with explosive personality. (Respondent's Ex. 39 at 177.) Mr. Schuster obviously erroneously equated explosive personality disorder with brain damage and testing for explosive personality disorder with neuropsychological testing. Simply put, trial counsel in this case had no idea of, and did nothing to learn about, the significance of developing mental health testimony and evidence for the penalty phase of a capital trial, even if such testimony and evidence would not have assisted mental-health-based claims at the guilt-innocence phase of the trial.

■ Respondent argues that the record supports the conclusion that Petitioner's trial counsel reasonably made a strategic decision to abandon their investigation of Petitioner's mental health based on their belief that presenting evidence of organic brain damage during the penalty phase was inconsistent with the guilt phase strategy of innocence. However, trial counsel must be sufficiently informed of the mitigating evidence that is available before they can make a decision that is properly characterized as strategic. See Wiggins, 539 U.S. at 527–28, 123 S.Ct. 2527 (finding ineffective assistance because "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible"); see also Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) ("In order for counsel to make a professionally reasonable decision whether or not to present certain mitigating evidence ... that counsel must be informed of the available options."); Horton, 941 F.2d at 1462 (rejecting "the notion that a 'strategic' decision can be reasonable when

the attorney has failed to investigate his options and make a reasonable choice between them"). Here, trial counsel had the option of presenting powerful mitigating evidence regarding Petitioner's brain damage, albeit at the risk that such evidence would imply Petitioner's guilt and weigh against trial counsel's credibility, since trial counsel had advocated a theory of innocence during the liability phase of the trial. Alternatively, trial counsel had the option of arguing residual doubt and pleading for the jury's mercy. Trial counsel elected the latter option but without reasonably investigating the alternative, especially given the red flag raised in Dr. Dudley's report. Therefore, even if trial counsel's decision was "strategic," the decision was not an informed decision and therefore was unreasonable.

Had Petitioner's trial counsel investigated the traumatic injury to Petitioner's head, as Dr. Dudley recommended, they may have abandoned the residual doubt strategy. A mere investigation into the possibility of brain damage would not have required trial counsel to commit to a presentation of mental health evidence, instead of a residual doubt strategy, without knowing the outcome of that investigation. While presentation of mitigating mental health evidence and a residual doubt strategy arguably might have been in conflict, dual investigations certainly would not have been. Here, Petitioner's counsel decided to press forward with a residual doubt strategy without first sufficiently investigating the mental health alternative.

Finally, Judge Carnes, in his dissenting opinion, identified yet another reason why the pursuit of a residual doubt strategy does not excuse trial counsel's failure to investigate Petitioner's brain damage. He explained this reason at length:

> Trial counsel did not actually pursue a residual doubt strategy, at least not one worthy of the name. The state collateral court never found that a residual doubt strategy was actually used. The majority says one was, but the record tells another story.

As I have already pointed out, trial counsel called Jefferson and five other witnesses to testify at the sentence stage. None of them gave any testimony relevant to residual doubt. The jury heard Jefferson testify about his life and heard him deny that he was guilty of some of the prior crimes on his record. But they did not hear him deny that he had robbed and murdered the victim in this case, Ed Taulbee. Conspicuously, Jefferson said nothing at all about that. Trial counsel never asked the most important question to a residual doubt defense: Did you do it? Their failure to ask that question is inconsistent with the majority's theory that a residual doubt strategy trumped the need to investigate mitigating circumstances based on the serious head injury that Jefferson had suffered. A residual doubt strategy in which the defendant takes the stand at sentencing but does not deny committing the crime is a strategy not pursued.

Jefferson's two attorneys divided the closing argument at the sentence stage. Marc Cella argued first. The majority opinion states that he "emphasized during the closing argument of the penalty phase that there were no eye witnesses to the crime, no guilty plea, and 'no evidence of any consciousness of guilt.'" Maj. Op. at 1296. The record shows, however, that Cella did not emphasize any of that. He merely mentioned it. He talked about the evidence of guilt in only four sentences, with a lead in of three more, in his twenty-one pages of closing argument. Any weaknesses in the case against Jefferson were not emphasized. What was emphasized was the need for mercy despite guilt.

The bulk of Cella's closing argument was about mitigating circumstances that the jury should find despite Jefferson's guilt. Cella talked about how Jefferson grew up in unfortunate circumstances "in the ghetto" and mostly without a father. Cella asked the jury to "[r]ealize that you are looking at someone who grew up in an entirely different environment than most of you have experienced" and to "realize that you are looking into a different culture." He urged the jury to consider that the people with whom Jefferson associated had been a bad influence on him. Cella also pointed out Jefferson's positive qualities, such as his "good work record" and his desire to provide for his family.

Cella attempted to explain Jefferson's history of getting into trouble this way:

> It's rough growing up in a house without that fatherly influence, even putting aside the problems with worrying about your income, worrying about your landlord evicting you, worrying about your mentally retarded brother and your sisters, taking care of them while your mom is in high school. He had problems to deal with. And he did the best he could.
>
> You know, it's very difficult for us to sit in judgment on someone whose burdens we haven't had to bear. Each one of us has been put on this life, and we are destined from the day we are put here to travel our own paths, take our own way through life's travels and tribulations.
>
> Lawrence has had a rougher path than any of us.

[Respondent's Ex. 25: 1395] Cella asked the jury "not to make Lawrence Jefferson's mama and his children victims, too." He urged the members of the jury to "look in [their] hearts, find some understanding, some love, some compassion for Lawrence." He invoked religious references and asked the jury to have "compassion and mercy." None of those arguments had anything to do with residual doubt. All of them would have been entirely consistent with evidence of conduct-altering brain damage caused by a serious head injury.

Cella's mercy-despite-guilt strategy is illustrated by his use of popular culture analogies. He told the jury about what he termed "the Star Wars philosophy," which uses Princess Leia and Darth Vader as symbols of pure good and pure evil. The world, Cella argued, is not that simple and "nobody is Dar [th] Vad[e]r in the real world." He argued instead that we all have the "capacity for both good and evil," concluding: "In heredity and our environment. And we don't have very much control heredity and our environment. And we don't have very much control over either one of them." Cella's remarks moved from *Star Wars* to *How the Grinch Stole Christmas.* He argued that the Grinch story illustrated that "[w]hen you change for the better, when we take mercy on someone, we gain strength." Cella also talked about the children's toy "Fearless Fotog," a superhero who has the power to drain the evil out of creatures by taking pictures of them and transferring the evil onto his film. He noted that the superhero was created by a twelve-year-old boy who believed that "there is good in all of us." He asked the jury to separate the good from the bad in Jefferson and have mercy on him.

The reason Cella talked at length about *Star Wars, How the Grinch Stole Christmas,* and "Fearless Fotog" is not that they supported a residual doubt strategy; they had nothing to do with residual doubt. Instead, they all supported Cella's mercy-despite-guilt strategy. The abundant mitigating circumstances that Cella and his co-counsel

could have offered if only they had asked for a neuropsychological examination would have been entirely consistent with that strategy.

Not only did Cella's remarks fail to carry along a residual doubt argument, he actually threw the possibility of residual doubt under the mercy bus. The only fleeting references to the evidence against Jefferson came early on in Cella's remarks, but after talking at length about why the jury should show him mercy, Cella told the jury this near the conclusion of his argument:

> You know, Lawrence's background, his life experience, has caused him to strike out at a defenseless person, such as Ed Taulbee, that he killed without necessity, and ya'll found that. But aren't we as a society better than that? Don't we expect more of ourselves? You folks are better people than Lawrence is right now. We trust you to be more just than he was.

[Id. at 1396] Those remarks concede that Jefferson killed the victim. They are inconsistent with a residual doubt strategy, which may explain why the state collateral court never found that counsel had such a strategy.

Schuster also made a closing argument to the jury, although it was only about one-fourth the length of Cella's. Schuster, like Cella, made a passing reference to the possibility of doubt: "Death is final. There is no margin of error. You find a man guilty beyond a reasonable doubt, but that's not all doubt." [Id. at 1401] But Schuster, like Cella, essentially threw away any residual doubt argument by telling the jury:

> Now, as [the prosecutor] said in his argument, you are not here to determine guilt or innocence. You have determined that. It is behind you. You have made your determination.

As an officer of the court I have to abide by it and I have to live by it. And as Marc [Cella] said, though, the issue you have now is which of two very, very severe sentences you give.

[Id.] And Schuster, like Cella, spent almost all of his time arguing for mercy despite guilt.

Schuster told the jury that the death penalty is reserved for the "most heinous situations" and stressed that under Georgia law the jury was free to return a life sentence for any reason or for no reason at all. He emphasized the hardships of Jefferson's upbringing as the basis for mercy. The following is a fair sample of his remarks:

> I am not going to come before you and say because he grew up among roaches and rodents he is not responsible for his acts. Lawrence Jefferson is responsible for his acts.

> But Lawrence Jefferson is not responsible for that person as much as that person who grew up in East Cobb or Dunwoody or West Cobb.

> We, or you, because you are a final arbiter of this case, have to decide whether or not to show mercy. You have to show it, decide whether or not to show mercy. You have to show it, decide sitting there, knowing that when this is all over you are going back to your nice home and your families, whether to show mercy.

> People do break out of their barrell [sic] of poverty. People do break out of that cycle of poverty. They are the exception rather than the rule. They do go to college and they have careers. They are the exception.

> Lawrence Jefferson's predecessors grew up in poverty, and Lawrence Jefferson's children will grow up in poverty, and their children's children will grow up in poverty.

Maybe we as a society have failed them. I don't know, Lawrence Jefferson failed himself,

But we should show him mercy. You should show him mercy. And I beseech you to show him that mercy and to sentence him to life imprisonment. [Id. at 1403–04] So, after telling the jury that the question of guilt or innocence "is behind you," Schuster, like Cella, argued for mercy despite guilt.

The point is that in a combined twenty-seven transcribed pages of argument Jefferson's attorneys made only two passing references to possible weaknesses in the state's case. One counsel acknowledged that the issue of guilt was closed while the other conceded that Jefferson had committed the murder, stating that his "background, his life experience, has caused him to strike out at a defenseless person, such as Ed Taulbee, that he killed without necessity." [Id. at 1396] A residual doubt strategy that concedes the defendant murdered the defenseless victim is not a strategy at all. In the proper circumstances residual doubt can be a strong argument for a life sentence. But these are not those circumstances and the argument, if made at all, was not effectively made. Jefferson, 570 F.3d at 1316–19 (Carnes, J., dissenting). Hence, because trial counsel did not really pursue a residual doubt strategy at sentencing, such a "strategy" cannot save them from being found ineffective. See Smith v. Spisak, 558 U.S. 139, 161, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010) (Stephens, J., concurring) ("[S]urely, a strategy can be executed so poorly as to render even the most reasonable of trial tactics constitutionally deficient under Strickland.").

No reasonable lawyer in counsel's position at the time would have decided not to have Petitioner tested for brain damage, particularly given Dr. Dudley's recommen-

dation that such testing would be worthwhile, the evidence readily available to counsel that Petitioner suffered a serious injury to his head as a child, and the fact that Petitioner's life was at stake. See Strickland, 466 U.S. at 668, 104 S.Ct. 2052 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."). Trial counsel's "strategic" decision and investigation were not reasonable in light of the guidelines set forth by the American Bar Association, which provide that the investigation into mitigating evidence in a capital case "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutors." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 11.4.1(c), p. 93 (1989); see also 1 ABA Standards for Criminal Justice 4–4.1, Commentary, p. 4–55 (2d ed. 1982) ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing . . . . Investigation is essential to fulfillment of these functions").

In the many Eleventh Circuit cases where the sufficiency of counsel has been upheld where counsel presented evidence in mitigation but not all available evidence, the attorneys had conducted a reasonable investigation and were at least aware of the possible evidence that was available and simply decided not to present the evidence. See, e.g., Jones v. Dugger, 928 F.2d 1020, 1028 (11th Cir. 1991); Clark v. Dugger, 834 F.2d 1561, 1567–78 (11th Cir. 1987); Funchess v. Wainwright, 772 F.2d 683, 690 (11th Cir. 1985). While "reasonably diligent counsel may draw a line [in their investigation] when they have good reason to think further investigation would

be a waste," Rompilla v. Beard, 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), trial counsel did not have a good reason here. Therefore, even if Petitioner's attorneys made a strategic choice not to spend additional time investigating Petitioner's mental health, the limit that counsel placed on the investigation was not supported by reasonable professional judgment. See Wiggins, 539 U.S. at 533, 123 S.Ct. 2527. Because Petitioner's counsel had no rational strategy or reason for failing to develop this mitigating evidence, their performance fell below an objective standard of reasonableness.

### 2. Prejudice

Presented with the additional mitigating evidence regarding Petitioner's organic brain damage, there is a reasonable probability that the jury would not have sentenced him to death. Strickland's prejudice prong is satisfied in this case, as the evidence that Petitioner's trial counsel could have presented would have: (1) offered an explanation, albeit not a justification, for how an otherwise largely inexplicable crime *could have* occurred; (2) substantially impacted any "mercy-based" juror decision-making on sentencing, since it figures directly into the state of the murderer's mind; and (3) weakened the aggravating circumstances of the crime.

The Eleventh Circuit has held in several cases that prejudice results from an attorney's failure to investigate and present or properly present mitigating mental health evidence. See Ferrell v. Hall, 640 F.3d 1199, 1226–36 (11th Cir. 2011); Baxter v. Thomas, 45 F.3d 1501, 1515 (11th Cir. 1995); Cunningham v. Zant, 928 F.2d 1006, 1019 (11th Cir. 1991); Stephens v. Kemp, 846 F.2d 642, 653 (11th Cir. 1988); Blanco, 943 F.2d at 1503; Middleton, 849 F.2d at 495; Armstrong v. Dugger, 833 F.2d 1430, 1432–34 (11th Cir. 1987). "The primary purpose of the penalty phase is to insure that the sentence is individualized by focusing the particularized characteristics of the defendant." Cunningham, 928 F.2d at 1019. Although the evidence put on by trial counsel during the penalty phase focused on some particular characteristics of Petitioner, trial counsel ineffectively failed to present mental health evidence to the detriment of Petitioner. As the Blanco and Armstrong courts concluded, " '[t]he demonstrated availability of undiscovered mitigating evidence clearly me[ets] the prejudice requirement.' " Blanco, 943 F.2d at 1505 (quoting Armstrong, 833 F.2d at 1434).

Except for the mental health evidence in this case no longer being unrebutted and not being as extensive, Petitioner's case, as far as the prejudice prong of Strickland is concerned, is similar to Ferrell v. Hall, where the Eleventh Circuit granted habeas relief based on the prejudicial effect of trial counsel's failure to investigate and present mitigating mental health evidence. The Eleventh Circuit's prejudice analysis and determination in Ferrell, including the discussion of what transpired during the penalty phase of that case and how the presentation of mitigating mental health evidence would have impacted the outcome of the proceeding, convinces this Court that a finding of prejudice in Petitioner's case is similarly warranted. 640 F.3d at 1234–36. In Ferrell, the petitioner suffered from organic brain damage and several other mental health illnesses about which the jury did not learn during petitioner's trial. As the case was governed by the arguably more stringent AEDPA standard, the Eleventh Circuit determined "that the Georgia Supreme Court unreasonably determined that there was no reasonable probability of a different outcome at a trial had the jury heard the totality of the mitigating evidence." Id. at 1234. There were several reasons for the Eleventh Circuit's decision. First, the Eleventh Circuit found the opinions of the petitioner's mental health

professionals to be compelling evidence of petitioner's mental deficiencies. Second, the Eleventh Circuit determined that the evidence would have weakened the aggravating circumstances found by the jury, as the evidence of the petitioner's frontal lobe problems and the resulting impact on petitioner's behavior would have served to demonstrate to the jury that the murders committed by petitioner were not entirely volitional. Third, because defense counsel focused primarily on arguing for mercy and did not actually pursue much of a residual doubt defense, the Eleventh Circuit reasoned that mitigating mental health evidence would have been consistent with trial counsel's approach at sentencing. Fourth, the Eleventh Circuit noted that testimony from witnesses during the penalty phase was sparse. These are the circumstances presented here.

First, the evidence the jury did not hear related to Petitioner's head being run over by a car at the age of two and the impact that Petitioner's injuries subsequently had on Petitioner, including the opinions of three mental health experts regarding the same, remains compelling, mitigating evidence, albeit not unrebutted. The jury did not know, for example, that Petitioner suffered a large laceration of the scalp and forehead, with the left side of the scalp being practically avulsed. They jury did not know that Petitioner's injuries required surgery and caused him to have swelling of the scalp and heavy fevers throughout his hospital stay of five days. The jury did not learn that Petitioner was withdrawn as a child, was slower than others to pick up on things, and had attention and concentration issues. The jury had no idea that Petitioner eventually began to have frequeht headaches and to experience dizziness and blurry vision. The jury was not told that Petitioner occasionally would faint. The jury was not informed that two mental health experts determined that Petitioner suffers from brain damage of the acquired, post-traumatic type and that a third mental health expert agreed with that diagnosis, assuming the accuracy of the results of tests performed by one of the other experts. The jury did not learn that one of those mental health experts was of the opinion that the brain damage suffered by Petitioner has manifested itself in the form of Petitioner having, among other things, attention issues, learning disabilities, affective instability, problems with impulse control, impaired social judgment, significant cognitive impairment, and transient outbursts of rage or anger, which are totally inconsistent with Petitioner's typical behavior. The jury did not learn that the other mental health expert believed Petitioner's brain damage compromised his ability to act in a normal and acceptable manner and altered his ability to plan and coordinate his actions, to be aware of the consequences of his behavior, and to engage in premeditated or intentional acts.

The mental health evidence would have provided the jury an explanation for Petitioner's past behavior and his testimony regarding his past behavior. In this regard, Dr. Price noted the following:

> Generally a person with this type of medical and physical condition is unable to learn from his or her mistakes, a condition starkly revealed but fundamentally mischaracterized during the sentencing trial in Mr. Jefferson's case. During Mr. Jefferson's testimony, the state reviewed a series of brushes with the law and/or authority figures that Mr. Jefferson had reportedly experienced. Following each of these experiences, Mr. Jefferson had reportedly been given a break, another chance, or an opportunity to learn from his mistakes without severe punishment. A person with Mr. Jefferson's disabling condition frequently cannot benefit from experience or "breaks" .... Repeated episodic spontaneous behavior which is organically

caused, cannot be corrected through the withholding or granting of rewards. It is not learned behavior, and hence it cannot be unlearned.

(Respondent's Ex. 40 at 345–46.) He further offered:

> [T]he sentencers were informed that Petitioner had committed a series of crimes, from petty offenses to robbery, before the offense in this case, and were led to believe that Mr. Jefferson somehow chose to lead a life of crime. Mr. Jefferson's testimony, offered to explain the earlier charges, ranged from his testimony that he was in the wrong place at the wrong time, to testimony that he did not participate in the crimes, to testimony that he had made a mistake, etc. All of this testimony is quite believable when one understands that Mr. Jefferson suffers from damage to his brain which causes spontaneous behavior with no or significantly reduced cognitive component, and that Mr. Jefferson's ability to learn from past mistakes is significantly compromised by his disability through no fault of Mr. Jefferson.

(Id.)

The presentation of rebuttal mental health evidence by Respondent, which Respondent only recently obtained while the case has been on remand to this Court, does not compel a conclusion that Petitioner did not suffer prejudice as a result of the jury not having heard any mitigating mental health evidence of brain damage whatsoever. To be certain, the jury would have had a more difficult task, having to weigh the opinions of Petitioner's experts against Respondent's expert. Indeed, Petitioner's and Respondent's respective experts disagree on many topics—the degree of brain injury Petitioner might have suffered, what should have been contained in Petitioner's hospital records to indicate a brain injury, the severity of brain damage that is necessary to support the findings that Dr. Merikangas and Dr. Price made about Petitioner, whether any brain injury Petitioner suffered resulted in a frontal lobe disorder, appropriate explanations for symptoms observed by Petitioner's family members, whether Petitioner still suffered from a brain injury at the time he committed the murder, the extent to which and the manner in which aggressive or impulsive behavior would be displayed over time as a result of organic brain damage, which neuropsychological tests should have been administered, what norms should have been used in scoring the various neuropsychological tests, the significance of scatter on intelligence tests, whether there is a nexus between learning disability and brain damage, and the role, if any, a structured environment, such as the military or prison, plays in tempering the impulsive behaviors typically associated with organic brain damage. However, just as Respondent's expert raised some legitimate questions about the opinions of Petitioner's experts and how they arrived at those opinions, Petitioner has raised legitimate issues concerning Respondent's opinions and how he arrived at his opinions.[12] The bottom line is that Petitioner

---

**12.** Juries routinely are exposed to experts who have conflicting opinions and are tasked with weighing and evaluating the conflicting opinions. To the extent there were issues with any of the experts' opinions or their critiques of the other experts, the Court expounded on those issues in its evidentiary findings included above. However, all of the experts were and are qualified and presented opinions and conclusions based upon their examinations and evaluations. That the opinions of Petitioner's experts contradicted, in some respects, the opinions of Respondent's expert comes as no surprise. The Court has not seen evidence and does not believe, having had its own opportunity to hear from the experts both on direct and cross-examination, that any of the experts who testified in this case are biased or have such unreliable opinions that the opinions should or would be disregarded all to-

had his head run over by a car when he was only two years or age, and he suffered a traumatic injury to his head as a result. While the opinions of Petitioner's experts regarding the impact that this traumatic injury had on Petitioner are not due to be accepted without critique or careful consideration, especially in light of the challenges Respondent has raised, a jury should have had an opportunity to hear and consider those opinions.[13] Due to trial counsel's deficient performance, Petitioner's sentencing jury had no such opportunity. Based on this Court's careful review of the mental health evidence presented both by Petitioner and Respondent, Petitioner has satisfied the Court that there is a reasonable probability that at least one juror would have found the mental health evidence presented compelling enough to vote against death, particularly when the other factors elaborated on below are taken into account. See Wiggins, 539 U.S. at 537, 123 S.Ct. 2527.

Consistent with the second reason that the Eleventh Circuit found prejudice in Ferrell, the evidence of Petitioner's brain damage in this case similarly would have weakened the aggravating circumstances found by the jury. The jury in this case found the existence of two aggravating circumstances: (1) the offense of murder was committed while the defendant was engaged in another capital felony (i.e., armed robbery); and (2) the offense of murder was "outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim." O.C.G.A. § 17–10–30(b)(2) and § 17–10–30(b)(7). Petitioner's mental health experts all agree that Petitioner is prone to be an impulsive individual and is not likely to give forethought to the consequences of his actions. Having considered the totality of the evidence available to them regarding Petitioner, Dr. Price and Dr. Merikangas attribute these characteristics of Petitioner to the head injury he suffered as a child, which they maintain resulted in frontal lobe problems. The opinions of these mental health experts would have "reduce[d] the violitional nature of the crime, as well as [Petitioner's] ability to plan and act rationally, and as a result, undercut the senselessness and cold-blooded nature of the crime as stressed by the prosecutor." Ferrell, 640 F.3d at 1235. Undoubtedly, this mental health evidence, even if challenged, would have been relevant as mitigating evidence. See O.C.G.A. § 17–10–30(b) (stating that the jury should be instructed to consider "any mitigating circumstances" during the penalty phase deliberations).

Third, as explained by Judge Carnes in his dissenting opinion and as set forth above in the Court's analysis of the deficiency prong, Petitioner's trial counsel really did not pursue a residual doubt strategy during the penalty phase at all.[14] The strategy was really one of "mercy-

---

gether. Moreover, Respondent's criticisms of Petitioner's experts and their opinions are not so persuasive that they end the prejudice inquiry.

**13.** Even if Petitioner were not able to link his mental impairment to the crimes convincingly, Petitioner's mental health evidence still would have been relevant mitigating evidence due to be considered by the jury. See Tennard v. Dretke, 542 U.S. 274, 285–88, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004) (holding that evidence of impaired mental functioning is inherently mitigating and that a defendant is not required to demonstrate a "nexus" be-

tween his mental capacity and the crime committed).

**14.** Evidence of guilt in Ferrell appears to have been more overwhelming than the evidence of Petitioner's guilt in this case, which means there was a greater chance in Petitioner's case that lingering doubt might have saved him from a sentence of death. However, irrespective of the extent to which Ferrell is distinguishable from Petitioner's case based on evidence of guilt, the effort of trial counsel in both Ferrell and this case to actually pursue a residual doubt strategy during the penalty phase was similarly lacking. Indeed,

despite-guilt," Jefferson, 570 F.3d at 1317 (Carnes, J., dissenting). Only 4 sentences of the 21 pages of Mr. Cella's argument were about residual doubt. The bulk of his argument during sentencing simply urged mercy. Indeed, Mr. Cella concluded his sentencing argument by admitting Petitioner's guilt: "You know, Lawrence's background, his life experiences, has caused him to strike out at a defenseless person, such as Ed Taulbee, that he killed without necessity, and y'all found that." (Trial Transcript at 1396.) Mr. Schuster, similarly, made only a passing reference to residual doubt in his closing argument during sentencing. Given that trial counsel's focus really was on mercy-despite-guilt, evidence of Petitioner's brain damage would have been wholly consistent with and supported that strategy. See Ferrell, 640 F.3d at 1235 ("[B]ecause defense counsel did not pursue much of a residual doubt defense, instead mostly focusing on mercy, mitigating evidence of Ferrell's mental health and childhood would have easily and directly supported the approach counsel offered at sentencing."); Jefferson, 570 F.3d at 1317 ("The abundant mitigating circumstances that Cella and his co-counsel could have offered if only they had asked for a neuropsychological examination would have been entirely consistent with that [mercy-despite-guilt] strategy.") (Carnes, J., dissenting).

Fourth, to truly appreciate the prejudicial effect of the absence of the mitigating mental health evidence, the scant mitigating evidence that Petitioner's trial attorneys presented during sentencing must be considered. The Eleventh Circuit previously summarized the mitigation presentation as follows:

In mitigation, Jefferson presented the testimony of two Cobb County deputies,

his mother, one of his sisters, the mother of his two children, and his own testimony. Ex. 25 at 1253, 1258, 1262, 1267, 1273, 1289. The employees of the Cobb County Sheriff's Department generally testified that Jefferson had caused no problems since his incarceration. Ex. 25 at 1253–60.

Jefferson's mother, Vera Jefferson, testified about his difficult childhood, which included growing up without a father and taking care of his siblings. Ex. 25 at 1263–65. She testified that Jefferson was responsible, generous, gentle, and kind, loved people and was very playful as a child. Ex. 25 at 1263–66. She mentioned to the jury that Jefferson was injured at the age of two when a car ran over the top of his head, but she was not questioned and did not offer any testimony regarding the impact, if any, that the accident had on him. Ex. 25 at 1264. Jefferson's mother asked the jury to have mercy on her son. Ex. 25 at 1266–67.

Jefferson's sister, Rita Jefferson, also testified about Jefferson's generosity and sense of responsibility. Ex. 25 at 1269–70. She explained to the jury that Jefferson would get her and her sisters ready for school, take them to school, bring them home from school, prepare them for bed, and take them to church. Ex. 25 at 1270–71. She added that he helped her with her sons. Ex. 25 at 1269. She testified about Jefferson being in the Navy and later attending vocational/technical school. Ex. 25 at 1269–70. Linda Dale, the mother of Jefferson's two children, testified that Jefferson was a good father, who was responsible and liked to work. Ex. 25 at 1275, 1278–79. She also said that he continued to have a

statements made by counsel in both cases actually undermined a residual doubt strategy. For this reason, the Court continues to

maintain that Ferrell is a comparable case to Petitioner's.

relationship with his children, even though he was in jail, and that she loved him. Ex. 25 at 1281.

Jefferson then testified. He discussed his difficult upbringing without a father, how he helped his mother raise his siblings, and his decision to leave high school to help make money for his family. Ex. 25 at 1290–92. He testified that he loved his children and never abandoned them, and contrary to the State's insinuations, he explained that he paid child support directly to his children's mother, though not to the court. Ex. 25 at 1294–95, 1320–22, 1333. He also explained that he had moved to Georgia to find work, and would send money to his family. Ex. 25 at 1296–97.

Jefferson then responded to the list of past crimes the State had introduced against him-including his armed robbery conviction, as well as his arrests for disorderly conduct, marijuana possession, attempted burglary of a house, theft by taking, harassment, and burglary of a service station-attempting to explain them away. Ex. 25 at 1297–1300, 1305, 1312–20, 1322–33. As for the armed robbery conviction, he said that he had been joyriding with his friends, and had not participated in any of the four robberies that supposedly happened that day, and had gotten in the car with them just before the police pulled it over. Ex. 25 at 1297–98, 1322–33. He explained that he had nonetheless pled guilty to the one armed robbery count because he was concerned that he would be charged for the other robberies and could not afford an attorney to fight the charge. Ex. 25 at 1299. As for the other arrests, Jefferson generally claimed that he had not committed most of the crimes, but he had been in the wrong place at the wrong time. Ex. 25 at 1312–19.

Jefferson also detailed his schooling and job experiences, saying that he had re-ceived his GED while in prison, and had gone on to become certified in masonry, welding, and auto body work. Ex. 25 at 1300–01. He admitted that he had been expelled from junior high school for hiding in the gym while the girls were in there and other "goofy stuff." Ex. 25 at 1312. He further explained that he was dishonorably discharged from the Navy after three and a half years because he returned late from leave when his mother was sick. Ex. 25 at 1301–03, 1307–10. Finally, Jefferson denied telling the police that he wanted to be executed. Ex. 25 at 1306–07.

Jefferson, 570 F.3d at 1290–92. As shown, except for Petitioner's mother's brief reference to Petitioner's head injury as a child, these six witnesses generally testified about Petitioner's conduct in jail, life history, criminal history, work history, and service in the Navy, making up a total of only 35 pages of transcript. (Trial Transcript at 1253–88.) Completely absent from the mitigation presentation was any substantial mitigating evidence, like the mental health evidence described herein. The impact that such evidence might have had on the jury's willingness to extend mercy to Petitioner cannot be overstated.

In conclusion, notwithstanding the critiques of Petitioner's experts' opinions by Respondent's expert, Petitioner still has presented a compelling case that he suffers (and suffered) from organic brain damage, a dysfunction that affected, among other things, his cognitive ability and his ability to conform his actions. Significantly, Petitioner is not required to show that the jury would have preferred his mental health experts over Respondent's mental health expert. If trial counsel had presented evidence of Petitioner's brain injury and only one juror found that evidence sufficiently compelling to extend mercy to Petitioner and vote against the imposition of the death penalty, Petitioner would be serving a sentence of life right

now. Petitioner has to show only a "reasonable probability" that this would have occurred, and Petitioner has satisfied this burden. Because trial counsel unreasonably failed to investigate and present this compelling, mitigating evidence of brain damage and this evidence would have weakened the aggravating circumstances of the crime, this Court's confidence in the outcome actually reached at sentencing is significantly undermined. Petitioner thus has established prejudice resulting from trial counsel's ineffectiveness, and Petitioner is entitled to a new a sentencing hearing at which this mental health evidence can be presented.

## IV. CONCLUSION

For the foregoing reasons, the Court **FINDS** that Petitioner did not receive a full, fair, and adequate hearing that comported with due process before the state habeas corpus court. As a result, the factual findings are not entitled to a presumption of correctness. Having conducted its own evidentiary hearing and evaluated Petitioner's ineffective assistance of counsel claim de novo, this Court again **GRANTS** Petitioner's Amended Petition for Writ of Habeas Corpus by a Person in State Custody [Doc. No. 23] to the extent that the Court continues to find merit in the claim that Petitioner's trial counsel were ineffective during the penalty phase of trial. The Court **VACATES** Petitioner's death sentence and **ORDERS** Respondent Sellers to conduct a new sentencing hearing for Petitioner to commence within six months from the date of this Order, or if an appeal is taken from this Order, within six months of the date this Order becomes final.

SO ORDERED this 10th day of April, 2017.